FILED

2012 SEP 28  PM 1: 40

U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| ANDRE WILLIAMS, | ) | CASE NO. 1:09 CV 2246 |
| | ) | |
| Petitioner, | ) | JUDGE DONALD NUGENT |
| | ) | |
| v. | ) | |
| | ) | |
| BETTY MITCHELL, Warden, | ) | **MEMORANDUM OF OPINION** |
| | ) | **AND ORDER** |
| Respondent. | ) | |

## I.  Introduction

This matter is before the Court upon Petitioner Andre Williams' ("Williams" or "Petitioner") Amended Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 filed with this Court on October 13, 2009. (ECF 6). Williams challenges his convictions and death sentence imposed by the Court of Common Pleas of Trumbull County, Ohio. The Court has before it the Amended Petition (ECF 6), Respondent Betty Mitchell's ("Mitchell" or "Respondent") Amended Return of Writ (ECF 10), Williams' Traverse (ECF 12), and Williams' Notices of Supplemental Authority In Support of his Amended Petition and Traverse (ECF 31, 33). Thus, the matter is fully briefed and ready for disposition.

## II.  Factual Background

On August 15, 1988, George Melnick was killed and his wife, Katherine, was severely beaten during the robbery of their Warren, Ohio home. On September 28, 1998, Williams was

indicted on the following seven counts: (1) aggravated murder of George Melnick during the commission of an aggravated burglary, pursuant to Ohio Rev. Code § 2903.01; (2) aggravated murder of George Melnick during the commission of an aggravated robbery, pursuant to Ohio Rev. Code § 2903.01(A); (3) aggravated murder of George Melnick during the commission or attempt to commit rape, pursuant to Ohio Rev. Code § 2903.01(A); (4) attempted murder of Katherine Melnick, pursuant to Ohio Rev. Code §§ 2903.02 and 2903.01(A); (5) aggravated burglary of George Melnick, pursuant to Ohio Rev. Code § 2911.11; (6) aggravated  robbery of George Melnick, pursuant to Ohio Rev. Code § 2911.01; and (7) rape of Katherine Melnick, pursuant to Ohio Rev. Code § 2907.02.

The Ohio Supreme Court set out the following factual history, as adduced by the evidence presented at trial, upon considering Williams' direct appeal of his convictions and sentences:

On the evening of August 15, 1988, defendant-appellant Andre R. Williams and Christopher Daniel assaulted and robbed George and Katherine Melnick after forcibly entering their home on Wick Street in Warren, Ohio. Williams beat Mr. and Mrs. Melnick, killing him and leaving her for dead. He also attempted to rape Mrs. Melnick.

Between 9:00 p.m. and 10:00 p.m. on August 15, 1988, a neighbor of the Melnicks heard glass breaking and shortly thereafter heard Mrs. Melnick screaming "Oh, dear God," "Help me," "Please stop," and "No more." The screaming lasted for approximately one hour. No one called the police at that time. Two days later, another neighbor, concerned that she had not seen the Melnicks for two days, contacted the police. The investigating officers entered the Melnick home and found Mrs. Melnick lying under the kitchen table in a pool of her own blood. Though she had been severely beaten, she was alive. The police found Mr. Melnick in a bedroom. He was dead, and according to the police report, had been for some time.

Mrs. Melnick suffered from blunt force injuries including facial fractures. As a result of these injuries, surgeons removed her right eye. Her injuries also caused blindness in her remaining eye and diminished hearing. She has no memory of the attack. Her underpants, which she had been wearing before the attack, were

-2-

found beside her on the floor. A test for the presence of semen was performed; the results were negative.

An autopsy revealed that Mr. Melnick had been struck at least ten times and that he died as a result of multiple skull fractures and other "multiple and extensive blunt force injuries." Investigators found several items in the house that are believed to have been used in the attack on the Melnicks, including a lamp, a brick, an ax handle, and a piece of concrete block. The investigation revealed that several items were missing from the Melnick home, including a Magnavox VCR and Mrs. Melnick's purse, which had contained approximately $2,000 in $50 bills.

The ensuing police investigation focused on Williams and Daniel. Henry Daniel, Jr., Daniel's brother, and Lisa Tobe, Henry, Jr.'s girlfriend, testified that they saw Williams and Daniel on the night of the murder at the house of Henry Daniel, Sr., Chris Daniel's father. Both appeared "hyper" and spent five to fifteen minutes together in the bathroom. Shortly thereafter, Henry, Jr. saw blood on the bathroom wall and on Williams's hand and Lisa noticed a rust-colored spot on Daniel's shirt. Williams and Daniel had in their possession a brown gym bag, a VCR, and a "nice amount" of money.

The day after the murder, Williams bought a used car. He paid with nine $50 bills. Williams paid to have the car repainted with four $50 bills. The manager of the auto painting shop, who accepted payment from Williams, described him as so nervous that he needed help counting the money.

Numerous acquaintances (Jennifer Gunther, Lance Owens, Henry Daniel, Jr., Ruben Gunther, and Mario Daniel, Chris Daniel's brother) testified that Williams admitted to and bragged about his involvement in an assault and robbery on an elderly couple on Wick Street. According to the testimony of these witnesses, Williams and Chris Daniel waited outside the couple's home until the woman finished a telephone call, and then broke in. Once inside, Chris hit the woman in the head with a brick while Williams attacked the man with a stick and a lamp. Williams said they got $1,800 (mostly in $50 bills) and a VCR from the robbery. Another witness, Estill Peterman, testified that he overheard an argument between Chris Daniel and Williams about which of them had used the lamp and ax handle to kill the man.

With respect to the attempted rape of Mrs. Melnick, Williams told Lance Owens that just before he left the Melnick house, he was "on top of her" and was "trying to get some." Williams told Henry Daniel, Jr., "I raped the lady" and "I got some butt from the old lady." Ruben Gunther testified that Williams said he "got the butt from her." Mario Daniel heard Williams say he "tried to get some from the

-3-

lady."

During their investigation, the police found the Melnicks' VCR (it was identified by serial number) in a wooded area less than three-tenths of a mile from Henry Daniel, Sr.'s house. The police also found a brown nylon gym bag containing Mrs. Melnick's purse at the side of a road near Henry Daniel, Sr.'s house. Several hairs found in the purse were tested and compared to hair samples taken from Williams and Chris Daniel. The state's expert testified that one of the hairs was microscopically consistent with Daniel's hair and that another hair was similar to Williams' hair. The defense expert testified that he could not exclude the possibility that some of the hair taken from the purse was from Williams.

When initially interviewed by the police, Williams denied involvement in the incident and furnished an alibi. In the course of the interview, Williams asked detectives, "Do you talk with judges?" When a detective asked what he meant, Williams then said, "Would it go easier on me if you talked to one?"

The grand jury indicted Williams on three counts of felony-murder; each count was based on the separate underlying felonies of aggravated burglary, aggravated robbery, and rape. Each aggravated murder count alleged three R.C. 2929.04(A)(7) felony-murder death specifications and one R.C. 2929.04(A)(5), "course of conduct" death penalty specification. The grand jury also indicted Williams for attempted aggravated murder (Count Four), aggravated burglary (Count Five), aggravated robbery (Count Six), and rape (Count Seven).

The jury found Williams guilty on each aggravated murder count and guilty on all four death penalty specifications for each count. They also found him guilty of attempted aggravated murder, aggravated burglary, aggravated robbery and attempted rape. The jury found Williams not guilty of rape.

During the penalty phase, the prosecution moved to dismiss the aggravated murder charges in Counts Two and Three. Thus, only Count One, aggravated murder based on the underlying felony of aggravated burglary, with four capital specifications, was considered during the penalty phase.

During the sentencing phase, Williams presented witnesses who described his history and background. Frank C. Goodman, Director of Student Services in Special Education for Warren City Schools, testified that Williams was born on May 1, 1967, that he was placed in a developmentally handicapped program in the fourth grade, and that he had IQ scores of seventy-six in 1973, seventy-eight in 1978, and sixty-seven in 1983. Goodman also testified that Williams did poorly in school, repeated three grades, and stopped attending school when he was eighteen. According to an assistant principal from the high school Williams

-4-

attended, Williams was suspended during ninth grade for being in a fight but otherwise had only minor disciplinary infractions.

Emma Eggleston, whose son had grown up with Williams, testified that Williams had "always been a nice, little, young man." Williams's cousin described him as a "kind-hearted, helpful person," with a reputation as a "nice person." Madeline Vail, Williams's grandmother, who raised Williams, also testified. She stated that he was a "good and respectable" child, that he was an only child who never had the aid or assistance of a father, that he never gave her any particular problems with respect to discipline, respect, or control, and that he was not violent.

The parties stipulated that Williams had three misdemeanor convictions in his record: assault in February 1987, assault in December 1987, and shoplifting in February 1988.

In an unsworn statement, Williams proclaimed his innocence. He stated that while he had done nothing to Mr. and Mrs. Melnick, he was sorry about what had happened to them. He questioned the propriety of the jury's determining whether he (or any other person) should be put to death, stating, "there's only one person that should judge somebody's life and that's God, the man upstairs."

The jury recommended the death penalty, and the trial court sentenced Williams to the death penalty and prison terms.

*State v. Williams*, 74 Ohio St.3d 569, 570-573 (1996).

## III.  **Procedural History**

Petitioner's subsequent attempts to overturn his convictions and sentences have been unsuccessful. In order to obtain a proper understanding of this case, an outline of the relevant procedural history, both in the Ohio courts and in this Court, is necessary.

### A.  **Pre-Trial, Trial, and Sentencing**

As set forth above, Petitioner was indicted by the Trumbull County Grand Jury on September 28, 1988 on seven counts. Count One charged Petitioner with the aggravated murder of George Melnick during the commission of an aggravated burglary, pursuant to Ohio Rev. Code § 2903.01. Count Two charged Petitioner with the aggravated murder of George Melnick during

-5-

the commission of an aggravated robbery, pursuant to Ohio Rev. Code § 2903.01(A). Count Three charged Petitioner with the aggravated murder of George Melnick during the commission or attempt to commit rape, pursuant to Ohio Rev. Code § 2903.01(A). Count Four charged Petitioner with the attempted aggravated murder of Katherine Melnick, pursuant to Ohio Rev. Code §§ 2903.02 and 2903.01(A). Count Five charged Petitioner with the aggravated burglary of George and Katherine Melnick, pursuant to Ohio Rev. Code § 2911.11. Count Six charged Petitioner with the aggravated robbery of Katherine Melnick, pursuant to Ohio Rev. Code § 2911.01. Finally, Count Seven charged Petitioner with the rape of Katherine Melnick, pursuant to Ohio Rev. Code § 2907.02. (Apx. Vol. XLI at 11-16).[1]

The Indictment also contained four (4) specifications pursuant to Ohio Rev. Code § 2929.04(A) relating to each of above aggravated murder counts, i.e. Counts One through Three. As to each of these Counts, three of the specifications were based on the charge that Petitioner had purposely caused the death of George Melnick while committing, or attempting to commit, the underlying felonies of aggravated burglary, aggravated robbery, and rape and Petitioner was either the principal offender in the commission of the aggravated murder or, if not the principal offender, committed the aggravated murder with prior calculation and design. In addition, Counts One through Three contained the specification that Petitioner had murdered George Melnick as part of a course of conduct involving the purposeful killing, or attempt to kill, two or more persons. (Apx. Vol. XLI at 11-16).

Petitioner was arraigned on October 6, 1988. He was represented at arraignment by attorney

---

[1]    References in this Opinion to Appendix Volumes are to the appendix submitted in connection with Williams' first federal habeas petition in Case No. 1:99CV2399 (N.D. Ohio) (O'Malley, J).

Gerald Ingram, who filed a Limited Entry of Appearance for purposes of the arraignment only. (Apx. Vol. XLI at 34).  On November 3, 1988, upon finding Petitioner indigent, the trial court subsequently appointed  attorneys E. Winther McCroom and Thomas Schubert as trial counsel. (Apx. Vol. XLI at 47-48).

Numerous pre-trial motions were filed in the weeks leading up to trial.[2]  Of particular relevance to the instant matter, Williams filed a Motion to Provide Appropriation of Funds for Expert Assistance on November 16, 1988, seeking funds to hire a variety of experts including a psychologist. (Apx. Vol. XLI at 64-66).  The State opposed the Motion, arguing there was no evidence of mental illness or mental disease/defect and no motion filed regarding Williams' competency or insanity. (Apx. Vol. XLI at 89-93).  On November 28, 1988, the trial court denied

---

[2]    These include the following motions filed by Petitioner: Motion in Limine (Apx. Vol. XLI at 50-52); several Motions for Change of Venue (Apx. Vol. XLI at 53-54, 182); several Motions for Discovery (Apx. Vol. XLI at 56-58, 104, 110); Motion for Bill of Particulars (Apx. Vol. XLI at 60-61); Motion to Supplement Bill of Particulars (Apx. Vol. XLI at 112); Motion for Order directing that a Complete Copy of the Prosecutor's File be made and turned over to the Court for Review (Apx. Vol. XLI at 127); Motion to Compel Disclosure of Specific Requests for Exculpatory Evidence (Apx. Vol. XLI at 129); Motion for Disclosure of Impeachment Information (Apx. Vol. XLI at 133); Motion to Compel Disclosure of Aggravating Factors and Information Relating to Mitigating Factors (Apx. Vol. XLI at 135); Motion to Require Production of Polygraph Results (Apx. Vol. XLI at 137); Motion to Provide Forensic Expert Assistance (Apx. Vol. XLI at 139); Motion for Ruling on Peremptory Challenges (Apx. Vol. XLI at 154); Motion to Exclude Evidence re Other Crimes (Apx. Vol. XLI at 156); Motion for Individual Sequestered Voir Dire (Apx. Vol. XLI at 158); Constitutional Motion to Dismiss (Apx. Vol. XLI at 160); Motion to Prohibit Display of Evidence Exhibits until Admitted  (Apx. Vol. XLI at 162); Motion for Comprehensive Voir Dire (Apx. Vol. XLI at 164); Motion to Prohibit Evidence re Character of Victims (Apx. Vol. XLI at 166); Motion to Suppress (Apx. Vol. XLI at 168); Motion to Conduct Perpetuation of Witness Testimony on Camera (Apx. Vol. XLI at 170); Motions to Permit Accused to Appear in Civil Clothing and without Restraints (Apx. Vol. XLI at 172, 174); Motion to Exclude Photos of the Deceased (Apx. Vol. XLI at 180); Motion to Exclude Reference to Defendant's Criminal Record (Apx. Vol. XLI at 184).  The State also filed a number of Motions, including several discovery motions (Apx. Vol. XLI at 70,176) and a Motion to Perpetuate Testimony (Apx. Vol. XLI at 72).

Williams' request for an expert psychologist "on the basis that the defendant has not demonstrated that it is necessary and reasonable and has not filed a motion for incompetency or insanity." (Apx. Vol. XLI at 107).  However, the court noted that it "would appoint a psychologist or psychiatrist if requested by the defendant should the need arise as a result of the defendant having been found guilty thereby necessitating a hearing in regard to the penalty phase." (Apx. Vol. XLI at 107).

Jury selection began on December 18, 1988 and lasted fifteen days, until January 19, 1988. (Apx. Vol. XLII at 245).  Opening statements and testimony began on January 25, 1989, and trial concluded on February 15, 1989. (Apx. Vols. XXIV- XXXVIII).  On February 17, 1989, the jury unanimously found Williams guilty as to Counts One through Six, i.e. all three aggravated murder counts, attempted aggravated murder, aggravated robbery, and aggravated burglary.  (Apx. Vol. XLII at 324-343).  The jury found Williams not guilty of rape (Count Seven), but did find him guilty of the lesser included offense of attempted rape. (Apx. Vol. XLII at 343).[3]

On March 8, 1989, the sentencing phase of the trial commenced.  Williams called five witnesses, including Frank C. Goodman, Director of Student Services in Special Education for the Warren City Schools. (Apx. Vol. XXXIX).[4]   Mr. Goodman testified that, to enter the

---

[3]    Numerous motions were filed during and immediately after the guilt phase of the trial, including several Motions to Suppress, Motions for Change of Venue, a Motion to Strike Testimony regarding Rape Charge, a Motion for Mistrial, a Motion for Second Voir Dire, a Motion to Prohibit Instructions regarding Mitigating Factors Not Raised by the Defense, Motion to Prohibit References that Verdict as to Death is Only a Recommendation. (Apx. Vol. XLII at 248, 285, 294, 301, 317-323, 367, 374, 380, 390).

[4]    Williams also called a sixth witness, defense attorney Scott Kirchbaum, to testify that, in his expert opinion, Williams' criminal history is not tantamount to a "significant criminal record." The State objected.  The trial court allowed Williams to question Mr. Kirchbaum outside the presence of the jury in order to proffer his testimony. After considering the arguments of the parties, the court determined Mr. Kirchbaum's testimony was not admissible and excluded it. (Apx. Vol. XXXIX at 49-88).

developmentally handicapped special education program in the Warren City Schools, a student must have an IQ of 80 or below and deficiencies in "two areas of what is called adaptive behavior which has to do with various types of functioning such as communication skills, living skills, these types of things." (Apx. Vol. XXXIX at 19). He explained that Williams had been evaluated by school psychologists and placed in a developmentally handicapped program when he was in the fourth grade. (Apx. Vol. XXXIX at 18-21). He testified that Williams' IQ had first been tested as part of this evaluation process in 1973 (when Williams was six years old) and that he had an IQ of 76. (Apx. Vol. XXXIX at 21). Williams was re-evaluated again in 1978 when he was approximately eleven years old, and was found to have an IQ of 78. (Apx. Vol. XXXIX at 23). Williams' last IQ testing by the Warren City Schools occurred in 1983 when he was almost sixteen years old, and indicated that Williams had an IQ of 67. (Apx. Vol. XXXIX at 24). Goodman also testified that Williams did poorly in school, repeated three grades, and stopped attending school when he was eighteen. (Apx. Vol. XXXIX at 25-30). Williams' school records (including his grades, attendance records, and the three psychological tests measuring his IQ in 1973, 1978, and 1983) were admitted into evidence as Defendant's Mitigation Exhibit A. (Apx. Vol. XXXIX at 15-16, 126).

On March 10, 1989, the jury returned a recommendation of death. On March 15, 1989, the trial court issued a Sentencing Opinion, in which it found that the aggravating circumstances outweighed the mitigating factors and imposed a sentence of death. (Apx. Vol. XXXIX at 401-408). As relevant to the instant matter, the trial court determined:

The following factors were considered in possible mitigation of the death penalty:

* * *

(2) Whether at the time of committing the offense, the defendant, because of a

-9-

mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. In regard to this factor, the Court finds that the defendant had an IQ of below normal and varied from 78 to 67 at various times in his life. However, there was no expert testimony introduced that this amounted to a mental defect or that the defendant lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. The Court specifically finds that this was not a mitigating factor in regard to the defendant's ability to appreciate the criminality of his conduct but did consider the fact that the defendant had a below normal I.Q. as a general, relevant, mitigating factor in this case;

* * *

(5) The Court also considered as other mitigating factors that the defendant came from a poor background and that he was in special education as a result of being below average intelligence . . . ; that he did not graduate from high school and that his relatives considered him to be of good character. When weighing the aggravated circumstances as previously outlined against the mitigating factors, the Court finds that the mitigating factors which the Court considered not only were outweighed by the aggravated circumstances, but in fact that they pale in comparison thereto.

(Apx. Vol. XXXIX at 401- 408). The court also noted later in its Opinion that "[t]he planning surrounding the crime indicates that the crime was not committed as a result of low intelligence or impaired judgment." (Apx. Vol. XXXIX at 407).

The trial court sentenced Williams to death on the aggravated murder charge set forth in Count One[5] and consecutive terms of actual incarceration of seven to twenty-five years for attempted aggravated murder; ten to twenty-five years for aggravated burglary; ten to twenty-five years for aggravated robbery; and eight to fifteen years for attempted rape.

**B.    Direct Appeal and Post-Conviction Process**

---

[5]    The State moved to dismiss Counts Two and Three of the Indictment after the guilty verdict was returned. The remaining aggravated murder count, Count One, was predicated upon the underlying felony of aggravated burglary. *See* Apx. Vol. XXXIX at 182.

-10-

Williams filed direct appeals to the Eleventh District Court of Appeals and the Ohio Supreme Court. Both courts affirmed his conviction and sentence.[6] *See State v. Williams*, No. 89-T-4210, 1995 WL 237092 (Ohio Ct. App. Mar. 24, 1995); *State v. Williams*, 660 N.E.2d 724 (Ohio 1988). In affirming the imposition of the death penalty, the Ohio Supreme Court considered the issue of Williams' low IQ as a mitigating factor but found that "no evidence at trial established that Williams' low IQ caused him to lack the 'substantial capacity to appreciate the criminality of his conduct' or 'conform' to the law." *Williams*, 660 N.E.2d. at 735. Williams filed a Petition for Writ of Certiorari in the United States Supreme Court, which was denied on October 7, 1996. *Williams v. Ohio*, 519 U.S. 835 (1996).[7]

In September 1996, Williams filed his first petition for post-conviction relief in the Trumbull County Court of Common Pleas pursuant to Ohio Rev. Code § 2953.21, raising seven claims for relief. On July 29, 1997, the trial court denied this petition without conducting an evidentiary hearing. *State v. Williams*, Case No. 88-CR-365 (Trumbull Cty Ct. Cmn. Pl. July 29, 1997). On appeal, the state appellate court affirmed the dismissal of Williams' petition. *State v. Williams*, No. 97-T-0153, slip op. (11th Dist. Ct. App. Oct. 19, 1998). Williams then filed an appeal

---

[6] Although the state appellate court affirmed Williams' conviction and death sentence, it reversed the aggravated murder count predicated on rape/attempted rape because it determined that the evidence was insufficient to find that Williams intended to rape Katherine Melnick at the time he killed George Melnick. The State cross-appealed this decision to the Ohio Supreme Court. That court reversed the appellate court holding, finding that the term "while" found in Ohio Rev. Code § 2903.01(B) does not indicate that the killing must occur at the same instant as the rape but, rather, it must be part of one continuous occurrence. *Williams*, 660 N.E.2d at 733.

[7] Williams was represented on his direct appeals to the state appellate court and Ohio Supreme Court by attorneys Thomas Zena and Gary Van Brocklin. He was represented by attorneys John Juhasz and Timothy Franken in his Petition for Writ of Certiorari.

-11-

with the Ohio Supreme Court, which declined to exercise jurisdiction. *State v. Williams*, 706

N.E.2d 788 (Ohio 1999).[8]

### C. First Federal Habeas Petition

On October 6, 1999, Williams filed a Notice of Intent to file a petition for writ of habeas

corpus in this Court pursuant to 28 U.S.C. § 2254. *See Williams v. Mitchell*, Case No. 1:99CV2399

(N.D. Ohio) (O'Malley, J.) (ECF 3). Williams also filed motions to proceed *in forma pauperis* and

for appointment of counsel. *Williams*, Case No. 1:99CV2399 (ECF 1, 4). The Court granted both

motions, and appointed attorney William McGinty and the Office of the Ohio Public Defender as

counsel. *Williams*, Case No. 1:99CV2399 (ECF 5, 6). Williams then moved the Court to appoint

counsel other than the Ohio Public Defender. *Williams*, Case No. 1:99CV2399 (ECF 11). The

Court granted the motion and appointed Mark Stanton as co-counsel.

Williams filed his Petition on March 1, 2000, raising thirty-one (31) claims for relief.

*Williams*, Case No. 1:99CV2399 (ECF 21). Respondent subsequently filed her Return on April 21,

2000, Williams filed his Traverse on June 27, 2000, and Respondent filed a Sur-Reply on July 11,

2000. *Williams*, Case No. 1:99CV2399 (ECF 24, 29, 30). Williams filed a motion for discovery,

which the Court denied. *Williams*, Case No. 1:99CV2399 (ECF 36, 39). He did not seek an

evidentiary hearing or request oral argument before the Court.[9]

---

[8]    Williams was represented by attorney John Juhasz in his first petition for post-conviction relief.

[9]    Williams also filed a motion to stay proceedings pending his return to state court to apply to the state appellate court to reopen his direct appeal pursuant to Ohio Rule of Appellate Procedure 26(B). *Williams*, Case No. 1:99CV2399 (ECF 40). The Court denied the motion without prejudice on June 27, 2002. *Williams*, Case No. 1:99CV2399 (ECF 43). In pleadings filed last year in the Sixth Circuit, Williams indicates he filed a Rule 26(B) Application in the state appellate court on December 10, 2009. *See Williams v. Bradshaw*,

On March 28, 2003, the Court (through Judge Kathleen O'Malley) issued a lengthy Opinion & Order denying Williams' petition. *Williams*, Case No. 1:99CV2399 (ECF 45). In its Opinion, the Court considered (among other claims) Williams' argument that counsel were ineffective for failing to obtain a mitigation specialist or other mental health professional who could have explained his IQ scores and alleged learning disabilities to the jury. *Williams*, Case No. 1:99CV2399 (ECF 45 at 83). The Court declined to undertake an in-depth analysis of this claim because it was procedurally defaulted. *Id.* The Court did note, however, that "the mental impairments that [Frank] Goodman described . . . may entitle Williams to pursue" relief pursuant to *Atkins v. Virginia*, 536 U.S. 304 (2002), which was decided after the filing of Williams' petition.[10] *Williams*, Case No. 1:99CV2399 (ECF 45 at 84). The Court declined to issue a certificate of appealability as to any of Williams' claims. *Williams*, Case No. 1:99CV2399 (ECF 45 at 117).[11]

---

Case No. 03-3626 (6th Cir.) (Status Report filed 2/2/11). The state appellate court denied the Application on March 29, 2010. *State v. Williams*, Case No. 89-T-4210, slip op. (11th Dist. Ct. App. March 29, 2010). Williams appealed, and the Ohio Supreme Court affirmed on January 26, 2011. *State v. Williams*, 129 Ohio St.3d 19 (Jan. 26, 2011).

[10]   As discussed *infra*, the Supreme Court determined in *Atkins* that the execution of a mentally retarded person violates the Eighth Amendment's prohibition against "cruel and unusual punishment." *Atkins*, 536 U.S. 304. In *State v. Lott*, 97 Ohio St.3d 303 (2002), the Ohio Supreme Court addressed the implications of *Atkins* for Ohio's capital punishment scheme and adopted three criteria for establishing mental retardation: (1) significant sub-average intellectual functioning; (2) significant limitations in two or more adaptive skills, such as communication, self-care, and self-direction; and (3) onset before the age of 18. *Lott* at ¶ 12.

[11]   The Court notes that Williams filed a motion in the Sixth Circuit in February 2011 requesting that it remand Case No. 99CV2399 to this Court "to allow counsel to seek a re-determination of whether any issues should now be certified for appeal in light of" the state courts' recent denial of his Rule 26(B) Application, discussed *supra*. To this Court's knowledge, the Sixth Circuit has not yet ruled on Williams' motion.

Williams thereafter filed a motion to stay his federal habeas action and hold it in abeyance while he returned to state court to pursue a claim under *Atkins, supra*. *Williams*, Case No. 1:99CV2399 (ECF 47).  On April 24, 2003, the Court denied the request, reasoning that the habeas petition had been denied and, therefore, there was no action before the Court to stay. *Williams*, Case No. 1:99CV2399 (ECF 48).  Williams filed a notice of appeal in the Sixth Circuit. *Williams*, Case No. 1:99CV2399 (ECF 49).  On June 27, 2003, the Sixth Circuit granted Williams' motion to stay and hold the case in abeyance to allow him to pursue his state-court *Atkins* litigation. *See Williams v. Bradshaw*, Case No. 03-3626 (6th Cir. June 27, 2003).[12]

### D.  State-Court *Atkins* Litigation

On June 9, 2003, Williams filed a "Petition to Vacate Andre R. Williams' Death Sentence Pursuant to *Atkins v. Virginia*, 122 S.Ct. 2242 (2002), *State v. Lott*, 97 Ohio St.3d 303 (2002), and Ohio Revised Code § 2953.21." (Suppl. Appx. Disc 1 at 430-435).[13]  In that Petition, Williams argued his death sentence "is void or voidable and must be nullified due to the fact that he is a person with mental retardation." (Suppl. Appx. Disc 1 at 430).  In support of his Petition, Williams cited the mitigation testimony of Frank Goodman regarding Williams' placement in his elementary school's developmentally handicapped program, as well as Williams' school records, psychological

---

[12]  The Sixth Circuit ruled to extend the appointment of attorneys William McGinty and Mark Stanton as counsel for Williams. Williams later moved, *pro se*, for the appointment of new counsel. On October 14, 2003, Messrs. McGinty and Stanton moved to withdraw as counsel. The State did not oppose the request. The Sixth Circuit stated it would consider appointment of substitute counsel at a later date. On June 11, 2009, the Federal Public Defender for the Northern District of Ohio was appointed as counsel for Williams. *See Williams v. Bradshaw*, Case No. 03-3626 (6th Cir.) (docket).

[13]  References in this Opinion to Supplemental Appendix Discs 1, 2 and 3 refer to the appendix filed in this matter via disc on January 20, 2010 and March 11, 2010. (ECF 8,9, 15, 16).

-14-

reports, and IQ tests. (Suppl. Appx. Disc 1 at 431).

In addition, the Petition attached an affidavit from Williams' cousin, Stacey Vail. (Suppl. Appx. Disc 1 at 435).  Ms. Vail averred that she had known Williams from his "early pre-school years" until the date of his conviction and that she had interacted with him consistently throughout this period and "observed him in social, educational, and familial environments."  (Suppl. Appx. Disc 1 at 435).  She further stated:

> * * *
>
> That she noticed immediately that Petitioner Williams neither possessed nor developed the ability to distinguish any nuance in language or behavior in others;
>
> That he would always accept every statement from another in a literal sense and could not perceive or understand the motivation of others;
>
> That Petitioner would oftentimes be unable to respond to basic inquiries from others and would stammer incomprehensible babble on these occasions;
>
> That she knew of no other individual during the relevant time period between Petitioner's pre-school years and the date of his conviction that she would consider to be intellectually inferior to Petitioner;
>
> That it was common, accepted knowledge in the Warren school system and neighborhood that Petitioner was severely challenged in a mental capacity and could not learn to cope on a day to day basis on any level;
>
> That she never observed any improvement in Petitioner's mental capacity at any time during the relevant period.

(Suppl. Appx. Disc 1 at 435).

Williams maintained the State was barred by the doctrine of collateral estoppel from contesting his mental retardation, arguing that "[t]he fact that Williams is a person with mental retardation is a fact of record in his case that was proven at trial." (Suppl. Appx. Disc 1 at 432). He further asked the court to take judicial notice of the evidence adduced at trial "which demonstrates

-15-

the irrefutable fact that Petitioner is a person with mental retardation." (Suppl. Appx. Disc 1 at 432).

Finally, in the event the court rejected his collateral estoppel and judicial notice arguments,

Williams asked the court to conduct an evidentiary hearing and allow him to conduct discovery and

retain an expert.[14]

Shortly thereafter, the trial court ordered Mansfield Correctional Institution ("MCI") to "turn

over the complete prison file, under seal, for [Williams], including but not limited to: [Rules

Infraction Board] file, Unit File, reports of all psychological evaluations including the psychological

protocols, IQ scores, sub-test scores, Adaptive Behavior measures and projective techniques, DSM-

IV diagnoses, and any disciplinary infractions in the institution." (Suppl. Appx. Disc 1 at 443).

Williams' prison records were received by the court on July 16, 2003, and made available to the

parties for review and copying. (Suppl. Appx. Disc 1 at 447).

On August 20, 2003, the State filed a Motion seeking to dismiss Williams' *Atkins* Petition

and/or grant summary judgment in the State's favor. (Suppl. Appx. Disc 1 at 477-683). In its

Motion, the State maintained Williams had presented insufficient evidence of mental retardation

to warrant either a hearing or judgment in his favor. The State questioned the reliability of

---

[14]     Williams also filed a motion seeking the appointment of attorneys William McGinty
and Mark Stanton as counsel. (Suppl. Appx. Disc 1 at 436). The State opposed this motion
on the grounds that Williams' had not demonstrated his claims had "arguable merit" and he
was not entitled to appointed counsel in post-conviction proceedings in the absence of such a
showing. (Suppl. Appx. Disc 1 at 455-460). Moreover, the State noted Williams had
previously filed several *pro se* motions in the Sixth Circuit Court of Appeals asking that
attorneys McGinty and Stanton be removed from his federal habeas appeal. (Suppl. Appx.
Disc 1 at 457-58). The State requested that, before any appointment be made, the court
ascertain from Williams whether he, in fact, authorized the filing of his state *Atkins* petition
and would accept attorneys McGinty and Stanton as counsel. (Suppl. Appx. Disc 1 at 458).
Messrs. McGinty and Stanton later moved to withdraw as counsel, and the trial court
appointed John Juhasz as Williams' *Atkins* post-conviction counsel. (Suppl. Appx. Disc 1 at
684-91, 692, 693).

Williams' IQ score of 67, noting that at the time Williams took this test he was 15 years old, often intoxicated, and "ready, willing and able to drop out of school." (Suppl. Appx. Disc 1 at 480-81). The State noted Williams had two IQ scores above 70 and characterized the sole, low IQ test as an "anamoly." (Suppl. Appx. Disc 1 at 484).

The State also pointed to numerous psychological evaluations conducted by MCI psychiatrists over the course of Williams' incarceration which failed to indicate mental retardation. Specifically, the State emphasized a July 2003 Interoffice Memo from Dr. Kenneth Covey, which referenced Williams' three, pre-incarceration IQ scores and noted that "[t]here are several written communications in [Williams' prison] file (letters to women and a young girl) that show good sentence structure, good spelling, appropriate punctuation, and neat handwriting and typing." (Suppl. Appx. Disc 1 at 516). Based on these letters, Dr. Covey concluded Williams' functioning was at a "level far above that of mental retardation" and further MRO screening was not necessary. (Suppl. Appx. Disc 1 at 516). In addition, the State pointed to several mental health assessments conducted by MCI psychiatrists in 2001 and 2002, none of which classify Williams as mentally retarded. (Suppl. Appx. Disc 1 at 533-36).

Relying on *pro se* legal documents and letters contained in Williams' prison file, the State further argued there was no evidence that Williams had any adaptive skill deficits. The State noted Williams had filed several *pro se* motions in the Sixth Circuit Court of Appeals to have his counsel removed and, further, had filed a *pro se* negligence action against MCI in the Ohio Court of Claims. In that action, the State alleged Williams had not only filed a *pro se* complaint, but also several *pro se* motions and an objection to the magistrate's report. The State also argued that Williams' voluminous prison correspondence (both hand and type-written) demonstrated a "well-developed

-17-

ability to communicate effectively through handwritten and type-written correspondence to promote his own interests and objectives." (Suppl. Appx. Disc 1 at 492-93). Finally, the State emphasized testimony from a suppression hearing indicating that, despite over four hours of police interrogation, Williams did not confess to any crimes and, in fact, refused to sign a waiver of rights form. (Suppl. Appx. Disc 1 at 502-3). Based on the above, the State maintained Williams had failed to present sufficient evidence of mental retardation warranting either an evidentiary hearing or judgment in his favor and requested the petition be dismissed.[15]

On October 21, 2003, Williams filed a motion seeking the appropriation of funds to hire Dr. James Eisenberg as an expert to investigate Williams' *Atkins* claim. (Suppl. Appx. Disc 1 at 704). The State opposed Williams' motion, and the court conducted a hearing on October 22, 2003. In a Judgment Entry dated October 23, 2003, the court granted Williams' motion and appointed Dr. Eisenberg to provide expert assistance to Williams in the presentation of his *Atkins* claim. (Suppl. Appx. Disc 1 at 708-10). The court further ordered that Williams' prison records be temporarily released to Williams' counsel and provided to Dr. Eisenberg for his review. (Suppl. Appx. Disc 1 at 709). In a separate Judgment Entry, the court also ordered MCI to provide Dr. Eisenberg with reasonable access to Williams so that he might conduct an examination. (Suppl. Appx. Disc 1 at 711-12).

On April 27, 2004, Williams filed a "Notice of Filing Appendix of Exhibits," in which he filed Williams' entire prison file with the Court. (Suppl. Appx. Disc 2 at 2829). The following day, Williams filed a brief opposing the State's Motion to Dismiss, which attached the preliminary report

---

[15]     The State also argued the doctrine of collateral estoppel was inapplicable because no state court had ever found Williams to be mentally retarded. (Suppl. Appx. Disc 1 at 507-08).

of Dr. Eisenberg. (Suppl. Appx. Disc 1 at 716- 49).  In his report, Dr. Eisenberg noted that he

conducted a clinical interview of Williams on November 14, 2003 and administered the Wechsler

Adult Scale of Intelligence Test, 3rd ed. ("WAIS-III"), Minnesota Muliphasic Personality Inventory,

2nd ed. ("MMPI") and the Test of Memory Malingering ("TOMM") "to determine if Mr. Williams

was mentally retarded consistent with the ruling in *Atkins* and *Lott*." (Suppl. Appx. Disc 1 at 728).

The report then stated that Williams scored a Full Scale IQ of 75, which placed him in the

"borderline range of intelligence."[16] (Suppl. Appx. Disc 1 at 729).  Dr. Eisenberg also noted that:

> Mr. Williams produced a valid, reliable, and consistent index of his current
> intellectual functioning.  He is significantly impaired in all areas of intellectual
> functioning both verbal and nonverbal, though his testing does not place him in
> the mentally retarded range of intelligence.
>
> * * *
>
> Mr. Williams was alert and fully oriented throughout the testing session that
> lasted approximately three hours.  He demonstrated no impairment in reasoning.
> He is intellectually limited but also curious as to word definitions.  There was no
> evidence of any underlying mental illness.  His verbal communication skills were
> coherent and logical.  He was alert, attentive, and oriented to person, place and
> time.

(Suppl. Appx. Disc 1 at 729 - 30).  Based on the above, Dr. Eisenberg concluded that "[i]t is my

preliminary opinion, with reasonable psychological certainty, that Mr. Williams does not currently

meet the criteria for a diagnosis of mental retardation based on the *Lott* definition." (Suppl. Appx.

Disc 1 at 730).

In light of this finding, Williams conceded that his claim "does not on its face appear to be

a strong one." (Suppl. Appx. Disc 1 at 717).  However, he noted there were "objective

---

[16]  Williams' test results also indicated that his Verbal IQ was 76 and his Performance
IQ was 78. (Suppl. Appx. Disc 1 at 729).

manifestations in the record" indicating mental retardation, including Ms. Vail's Affidavit and

Williams' school records indicating a previous IQ score of 67. (Suppl. Appx. Disc 1 at 720).

Williams further maintained that the *pro se* legal filings and letters attributed to him by the State

were unauthenticated and "[i]t is far more likely . . . that Petitioner relied on other inmates" to draft

these documents. (Suppl. Appx. Disc 1 at 717, 721, 725). Based on these discrepancies and

contradictions in the record, Williams argued the trial court was required to conduct an evidentiary

hearing to determine the merits of his *Atkins* claim.

On October 19, 2004, the trial court dismissed Williams' petition without a hearing. (Suppl.

Appx. Disc 2 at 2574- 90). The court first noted that it construed the State's motion as a motion

for summary judgment. (Suppl. Appx. Disc 2 at 2575). After reviewing Ms. Vail's affidavit,

Williams' school records, the MCI records attached to the State's Motion to Dismiss, and Dr.

Eisenberg's report, the court concluded that Williams had failed to submit evidentiary documents

containing sufficient operative facts to demonstrate his mental retardation. With respect to

Williams' IQ, the court noted that:

> In his initial petition, Petitioner referenced his 1983 IQ score of 67, a score
> achieved when Petitioner was 15 years of age. He then attached an affidavit from
> a relative who stated that as a child, Petitioner was "severely challenged in a
> mental capacity." In his Motion Opposing Judgment, which was filed in response
> to the State's motion to dismiss and/or motion for summary judgment, Petitioner
> attaches the results of 67 IQ test, as well as the results of two other IQ test results
> wherein he scored a 76 at age 6 and 78 at age 11.
>
> In Ohio, a criminal defendant is rebuttably presumed to not be mentally retarded
> if his IQ is above 70. *Lott*, at ¶ 12. This Court was faced with a dilemma of
> having one score below the rebuttable presumption and two scores above. As a
> result, this Court granted Petitioner's request for expert assistance to help resolve
> this issue. According to Petitioner's most recent evaluation, his full scale IQ is
> 75. This Court finds that Petitioner's three IQ scores over 70 outweigh his one
> IQ score of 67 and the affidavit from his cousin attesting to his mental deficits.

-20-

The Court must presume Petitioner is not mentally retarded.

(Suppl. Appx. Disc 2 at 2580).[17]   The court also found Williams failed to demonstrate any

significant limitations in adaptive skills, in light of evidence that Williams (1) had a clear plan in

mind to burglarize the Melnick home approximately one hour before doing so; (2) took the money

from the Melnicks' home and purchased a car with cash, demonstrating his desire and ability to

obtain transportation; (3) washed the clothing and shoes worn during the commission of the crimes

against the Melnicks; and (4) voluntarily appeared at the Warren Police Station, attempted to

fashion an alibi, and resisted police officers' attempts to obtain a confession. (Suppl. Appx. Disc

2 at 2581).

In addition, the court noted that the MCI records "serve to fortify this Court's impression

of Petitioner's well-developed adaptive skills, particularly in the arena of communications, self-

direction, and self-care." (Suppl. Appx. Disc 2 at 2582).   The court noted prison records indicating

that Williams could effectively order his own food and sundries, seek medical and psychiatric

assistance, advance his own legal interests and correspond with others.   Moreover, the court found

the record "reveals considerable self-direction in the perpetration of the crimes and Petitioner's

response to the investigating authorities." (Suppl. Appx. Disc 2 at 2586).   Finally, the court found

"the record is replete with examples of Petitioner's own hands-on approach to self care," including

prison records in which he sought psychiatric help for chronic masturbation, medication for

headaches, medication and music for stress, and nurses' visits for colds. (Suppl. Appx. Disc 2 at

---

[17]   The court placed "substantial weight" on Dr. Eisenberg's report in particular, noting that "Dr. Eisenberg was chosen by Petitioner himself to examine his mental status under the *Lott* standards" and, thus, "Dr. Eisenberg's conclusion is particularly powerful evidence that Williams is not retarded." (Suppl. Appx. Disc 2 at 2578).

2586).[18]

Lastly, the court found that Williams "fails to meet the third prong of the *Atkins/Lott* test, onset before age 18." (Suppl. Appx. Disc 2 at 2586). The court declined to construe the single IQ score of 67 at age 15 as an "onset" of mental retardation, particularly in light of Williams' two previous IQ scores placing him above 70. (Suppl. Appx. Disc 2 at 2586). Accordingly, pursuant to Civil Rule 56(C) and Ohio Rev. Code § 2953.21(G), the court found that "reasonable minds can come to but one conclusion and that conclusion is adverse to the Petitioner." (Suppl. Appx. Disc 2 at 2590). The court then dismissed Williams' petition without a hearing.

Williams appealed to the Eleventh District Court of Appeals, raising the following assignment of error: "The trial court erred in denying [Williams] an evidentiary hearing on his petition for post-conviction relief, thus depriving [him] of liberties secured by the U.S. Const. Amend. VI and XIV, and Ohio Const., art. I, §§ 1, 2, 10 and 16, including meaningful access to the courts of this State." *See State v. Williams*, Case No. 2004-T-0136 (11th Dist. Ct. App. Feb. 13, 2006), slip op. at 7. (Suppl. Appx. Disc 2 at 2681). The state appellate court reversed the trial court's decision, holding as follows:

> In the present case, the trial court's analysis confused the distinction between the dismissal of Williams' petition without hearing and the granting of summary judgment in the State's favor. The trial court also impermissibly

---

[18]    With regard to the authenticity of Williams' hand and type-written documents, the court found it "more likely than not that Petitioner authored these documents" in light of (1) the fact that Williams purchased a used typewriter and many of the documents appear to be composed on the same typewriter; (2) Williams' Death Row Case Manager Greg Morrow identified certain records as being consistent with Williams' written communications; (3) several of the records repeat a common writing style and style of greeting, which the court described as a "distinct, signature style;" and (4) Williams does not specifically disavow authorship of any of the records attached to the State's Motion to Dismiss. (Suppl. Appx. Disc 2 at 2583 - 85).

weighed conflicting evidence and made a number of findings of fact. Therefore, we must reverse and remand this cause for the court to address the issues of dismissal and summary judgment separately and to enter a new judgment on Williams' petition.

The trial court was entitled to dismiss Williams' petition without hearing if the court found that "the petition, the supporting affidavits, the documentary evidence, the files, and the records d[id] not demonstrate that petitioner set forth sufficient operative facts to establish substantive grounds for relief." *Calhoun*, 86 Ohio St.3d 279, paragraph two of the syllabus.  In making this analysis, the trial court has a limited ability to weigh the evidence proffered in support of the petition. "[A] trial court *** may, in the sound exercise of discretion, judge the credibility of the affidavits in determining whether to accept the affidavits as true statements of fact." *Id.* at paragraph one of the syllabus. The analysis for dismissing a petition without hearing focuses on the evidence proffered in support of the petition, not the evidence proffered in the State's response.

In a summary judgment exercise, the court must construe the conflicting evidence in petitioner's favor. Civ. R. 56(C).  The State is entitled to summary judgment if "there is no genuine issue as to any material fact" and "reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made." *Id.*

In its findings of fact and conclusions of law, the trial court noted that Williams submitted an IQ test result of 67, that the State submitted test results of 76 and 78, and that Dr. Eisenberg reported an IQ test result of 75.  In considering this evidence, the trial court found "that Petitioner's three IQ scores over 70 outweigh his one IQ of 67" and, therefore, "the Court must presume Petitioner is not mentally retarded." Elsewhere, the court states that it "grants substantial weight to the recent report prepared by Dr. Eisenberg" finding his conclusion "particularly powerful evidence that Williams is not retarded."  Rather than construing this evidence in Williams' favor, the court stated that it would "decide this claim by a preponderance of the evidence standard."

Although R.C. 2953.21(D) requires that the right to summary judgment appear "on the face of the record," the trial court admits that it considered "evidence *dehors* the record."  Some of this evidence "*dehors* the record" were unauthenticated documents submitted by the State that were allegedly hand-written or typed by Williams. See Civ. R. 56(C) and (E) regarding the evidence properly considered in a summary judgment exercise. The trial court overruled Williams' objection to these documents by conducting its own analysis of their authenticity.  The court's conclusion was that "pervasive" evidence existed

"that, more likely than not, Petitioner personally authored the documents."

*State v. Williams*, Case No. 2004-T-0136 (11th Dist. Ct. App. Feb. 13, 2006), slip op. at 8-10. (Suppl. Appx. Disc 2 at 2682- 84). Based on the above, the appellate court reversed the trial court's judgment dismissing the petition and remanded. The court noted that, on remand, the trial court "has three options before it:" (1) deny the petition without a hearing in accordance with Ohio Rev. Code § 2953.21 and *Calhoun*, 86 Ohio St.3d 279; (2) act on the State's summary judgment motion by correctly applying the standards set forth in Ohio R. Civ. Proc. 56(C); or (3) hold an evidentiary hearing on Williams' petition. *Id.* at 10 (Suppl. Appx. Disc 2 at 2684).

The State of Ohio appealed to the Ohio Supreme Court (Suppl. Appx. Disc 2 at 2703 - 21), which declined jurisdiction to hear the case and dismissed the appeal as not involving any substantial constitutional question. *State v. Williams*, Case No. 06-628 (Ohio Supreme Court July 5, 2006) (Suppl. Appx. Disc 2 at 2785).

On remand, the trial court again dismissed Williams' petition without a hearing. *State v. Williams*, Case No. 88-CR-365 (Trumbull Cty Ct. Cmn. Pl. Sept. 11, 2007) (Suppl. Appx. Disc 2 at 2826- 50).[19] The court explained that "[w]hether this Court construes [the State's] motion as a motion to dismiss based solely on [Williams'] original petition and his reply to the State's motion, or whether this Court factors in the extensive documentation presented by the State and construes its motion as a summary judgment motion, [Williams] is not entitled to a hearing regarding his claim of mental retardation." (Suppl. Appx. Disc 2 at 2831). The court then noted that it construed

---

[19]    On July 20, 2006, after this matter had been remanded to the trial court, Williams filed a Motion for Jury to Determine Issue of Mental Retardation, arguing he was entitled to have a jury empanelled to determine whether he was mentally retarded pursuant to the line of cases following *Ring v. Arizona*, 536 U.S. 584 (2002) and *Apprendi v. New Jersey*, 530 U.S. 4466 (2000). (Suppl. Apx. Disc 2 at 2800- 22).

its entry "as one granting summary judgment in favor of" the State. (Suppl. Appx. Disc 2 at 2831).

The court first rejected Williams' argument that his mental retardation had already been proven at trial and the State was, therefore, barred from "re-litigating" this issue under the doctrine of collateral estoppel. (Suppl. Appx. Disc 2 at 2832- 34). In response to Williams' judicial notice argument, the court also found that it would take judicial notice of all of Williams' IQ scores, including his score of 67, noting that "[n]either side has challenged the validity or admissibility of" these scores. (Suppl. Appx. Disc 2 at 2834). The court then explained that, pursuant to *State v. Calhoun*, 86 Ohio St.3d 279 (1999) and *State v. Coleman*, 2005 WL 1797040 at * 5 (Ohio Ct. App. 2nd Dist. July 29, 2005), it was permitted in Williams' post-conviction proceedings to weigh the credibility of affidavits "to a limited extent." (Suppl. Appx. Disc 2 at 2835).

The court then determined that the sole exhibit attached to Williams' *Atkins* petition, the Vail Affidavit, lacked credibility "because the affiant is [Williams'] cousin with an interest in the outcome of these proceedings, a portion of her affidavit relies on hearsay ('[I]t was common, accepted knowledge in the Warren School system and neighborhood that [Williams] was severely challenged in a mental capacity and could not learn to cope on a day to day basis'), and Ms. Vail's rather dismal portrayal of [Williams'] early childhood development is not supported by the Warren City School psychologists who evaluated him." (Suppl. Appx. Disc 2 at 2839). Moreover, the court noted that, even if accepted as true, "Ms. Vail's affidavit at best gives the court a glimpse into [Williams'] early childhood development, but does not present to this Court sufficient operative facts as to [Williams'] claim of mental retardation." (Suppl. Appx. Disc 2 at 2839). Specifically, the court noted that Ms. Vail does not state that Williams was ever diagnosed with mental retardation, educated as someone with mental retardation, labeled "mentally retarded" for purposes

-25-

of social security benefits, or that he benefitted from social programs geared to mentally retarded adults. (Suppl. Appx. Disc 2 at 2840-41).

The court further found the "additional, uncontested documentation" attached to Williams' Opposition to the State's Motion failed to support his *Atkins* claim. In particular, the court found Dr. Eisenberg's report failed to support Williams' claim since it states that Williams' test results indicated an IQ of 75 and Dr. Eisenberg concluded "with reasonable psychological certainty, that Mr. Williams does not currently meet the criteria of mental retardation based on the *Lott* definition." (Suppl. Appx. Disc 2 at 2841). In addition, the court found Williams' school records unpersuasive because they did not state that Williams' failing grades "were attributable to mental retardation, as opposed to borderline functioning, apathy, or poor attendance." (Suppl. Appx. Disc 2 at 2841-42). With respect to Williams' three IQ tests taken while he was a student, the court found these tests did not conclusively demonstrate mental retardation since two of those tests placed Williams above the *Lott* presumption of no mental retardation. (Suppl. Appx. Disc 2 at 2842). Based on the above, the court then concluded that Williams "failed miserably" to meet his burden of submitting evidentiary documents supporting his claim. (Suppl. Appx. Disc 2 at 2842).

The court went on to find that Williams also failed to submit sufficient evidentiary documents indicating significant limitations in two or more adaptive skills. Once again, the court relied on evidence adduced at trial regarding Williams' planning and perpetration of the crimes at issue, as well as his efforts afterwards to avoid detection. (Suppl. Appx. Disc 2 at 2843). Additionally, despite the appellate court's concern that Williams' prison records were unauthenticated, the court continued to rely on Williams' hand and type-written prison correspondence as evidence of Williams' lack of adaptive skill deficiencies. (Suppl. Appx. Disc

-26-

2 at 2845 - 49). In dismissing the appellate court's authentication concerns, the trial court noted that

Williams supplemented his Opposition to the State's Motion with the very prison records at issue

and requested that they be considered part of the record. The court also noted that Williams failed

to contest the authenticity of Mr. Morrow's affidavit, which identified several of the documents at

issue as being written in Williams' handwriting. (Suppl. Appx. Disc 2 at 2847). Moreover, the

court noted that Williams "never disavows authorship of any of the State's exhibits, much less

provides any evidence, such as an affidavit, from [Williams] or an unknown Death Row scrivener."

(Suppl. Appx. Disc 2 at 2848).

Accordingly, based on the above, the court found that "[w]hen viewed in a light most

favorable to [Williams], the record demonstrates, at best, *de minimis* limitations in some areas of

adaptive skills as a child, but not significant limitations in any adaptive skill as a child or adult."

(Suppl. Apx. Disc 2 at 2849). Thus, the court found Williams had failed to meet the second prong

of the *Atkins/Lott* test for mental retardation.

Finally, the court found again that Williams had failed to meet the third prong of this test,

i.e. onset of mental retardation before age 18. (Suppl. Appx. Disc 2 at 2849- 50). Specifically, the

court found "no evidence either within the record or *dehors* the record suggest[ing] that [Williams]

suffered from any specific limitations in adaptive skills before age 18 with the possible exception

that he 'babbled' as a child" according to Ms. Vail's affidavit. (Suppl. Apx. Disc 2 at 2850).

However, the court found this comment in Ms. Vail's affidavit was "not reinforced" by the

psychological evaluations conducted when Williams was a Warren City school student. (Suppl.

Apx. Disc 2 at 2850).

In light of these findings, the trial court found that Williams had failed to demonstrate

-27-

sufficient operative facts demonstrating mental retardation and granted summary judgment in the

State's favor. (Suppl. Apx. Disc 2 at 2850).

Williams appealed, raising the following two assignments of error:

I.      The trial court erred in granting summary judgment and denying
        [Williams] an evidentiary hearing on his petition for post-conviction
        relief, T.d. 186, thus depriving [Williams] of liberties secured by U.S.
        Const. Amend. VI and XIV and Ohio Const. Art. 1, § 1, 2, 10 and 16,
        including meaningful access to the courts of this State.

II.     The trial court erred when it denied [Williams] a determination by jury
        as to whether [Williams] is mentally retarded and therefore exempt from
        execution pursuant to U.S. Const. Amend. VIII and XIV and Ohio Const.,
        Art. 1, § 9.

(Suppl. Appx. Disc 2 at 2894-2931).

On June 30, 2008, the state appellate court issued an Opinion, affirming the trial court's

dismissal of Williams' *Atkins* petition. *State v. Williams*, Case No. 2007-T-0105 (11th Dist. Ct. App.

June 30, 2008) (Suppl. Apx. Disc 2 at 3007 - 39). Applying a *de novo* standard of review, the court

held:

In the present case, Williams has failed to raise a genuine issue as to the three
criteria for mental retardation established by *Lott*. As noted above, these criteria
are: "(1) significantly subaverage intellectual functioning; (2) significant
limitations in two or more adaptive skills, such as communication, self-care, and
self-direction; and (3) onset before the age of 18." *Lott*, 2002-Ohio-6625 at ¶ 12.

The only criterion for which Williams met his burden is the third criterion. The
evidence before the court does demonstrate that Williams had indications of
mental retardation before the age of 18. In 1973, Williams was described by a
school psychologist as functioning within the "educable mentally retarded" range
of ability. A later evaluation determined Williams was functioning, with respect
to "adaptive behaviors" such as communication and self-direction, at an age level
several years behind his actual age. In 1983, Williams received a full scale IQ
score of 67, which is below the score (70) at which he would be rebuttably
presumed not to be mentally retarded.

-28-

With respect to the first two criteria, however, Williams failed to introduce any evidence of present disability. As recently emphasized by the Ohio Supreme Court, the definition of retardation adopted by *Lott* contemplates "substantial limitations in **present functioning**." *White*, 2008-Ohio-1623 at ¶ 6, citing *Atkins*, 536 U.S. at 308 (emphasis added). Likewise, this court has stated that, although the manifestation of mental retardation must occur before the age of 18, "the determination of whether a defendant is mentally retarded under *Atkins* standards must be made in the present." *State v. Lorraine*, 11th Dist. No. 2006-T-0100, 2007-Ohio-6724, at ¶ 21.

The only recent psychological evaluation of Williams, conducted by a psychologist of his choosing, concluded "with reasonable psychological certainty" that Williams "does not currently meet the criteria for a diagnosis of mental retardation based on the *Lott* definition." Using the WAIS-III test, Dr. Eisenberg determined Williams to have a full scale IQ of 75, at which score he is rebuttably presumed not to be mentally retarded. *Lott*, 2002-Ohio-6625, at ¶ 12. Although Dr. Eisenberg acknowledges that Williams "is significantly impaired in all areas of intellectual functioning * * * , his testing does not place him in the mentally retarded range of intelligence."

It cannot be reasonably inferred from this evidence that Williams has significantly subaverage intellectual functioning and significant limitations in two or more adaptive skills. Williams' school records and evaluations, and the affidavit of his cousin Vail, only attest his intellectual capacity and functioning prior to 1989. They do not constitute competent evidence from which inferences may be made regarding his present mental capacity. [citation omitted].

With respect to limitations in adaptive skills, Williams presented no evidence of current significant limitations. The State, on the other hand, presented considerable evidence of Williams' ability to function competently, managing his legal affairs, procuring medicine and other necessities, and maintaining personal correspondence. The trial court also noted the trial record of the underlying crimes demonstrates Williams' ability to function and act for his own self-preservation.

The first assignment of error is without merit.

(Suppl. Appx. Disc 2 at 3017-19). The court also rejected Williams' second assignment of error,

finding that Williams was not entitled to a jury determination regarding his mental retardation as

-29-

a matter of law. (Suppl. Appx. Disc 2 at 3019-20).[20]

Williams appealed to the Ohio Supreme Court. (Suppl. Apx. Disc 2 at 2989-3024).  On December 31, 2008, with Chief Justice Moyer and Justices Pfiefer and Lundberg dissenting, the Ohio Supreme Court declined jurisdiction to accept the case for review. *State v. Williams*, 120 Ohio St.3d 1453 (Dec. 31, 2008). (Suppl. Appx. Disc 2 at 3039).

### E.    Instant Federal Habeas Petition

In July 2009, Williams filed a motion in the Sixth Circuit seeking leave to file a habeas corpus petition in federal court regarding his *Atkins* claim.  In an Order dated September 28, 2009, the Sixth Circuit granted Williams' motion for leave to file habeas corpus petition and transferred his Petition to this Court. (ECF 1, 2).

Williams filed an Amended Petition on October 13, 2009, raising the following two grounds for relief:

I.    MR. WILLIAMS IS MENTALLY RETARDED AND THUS INELIGIBLE FOR THE DEATH PENALTY.  MR. WILLIAMS'S SENTENCE OF DEATH VIOLATES HIS RIGHT TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT AS GUARANTEED BY THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

II.    BECAUSE MR. WILLIAMS IS MENTALLY RETARDED, HE CANNOT BE EXECUTED AND IS THEREFORE ACTUALLY INNOCENT OF THE DEATH PENALTY.

---

[20]    One judge, Judge Trapp, concurred in judgment only and wrote a separate opinion, indicating that she would have applied an abuse of discretion (rather than a *de novo*) standard of review in reviewing the trial court's dismissal of Williams' petition. (Suppl. Apx. Disc 2 at 3020-23).  In addition, Judge O'Toole filed a dissenting opinion, in which she found that "it is clear that *Atkins*, *Lott*, and *White* and their progeny, as well as the U.S. and Ohio constitutions require an evidentiary hearing to determine the issue of [Williams'] retardation." (Suppl. Apx. Disc 2 at 3024).

-30-

(ECF 6).  Respondent filed her Return of Writ on January 21, 2010 (ECF 10), and Williams filed his Traverse on February 23, 2010 (ECF 12).  Williams subsequently filed two Notices of Supplemental Authority in support of his Amended Petition and Traverse. (ECF 31, 33).

After the filing of his Traverse, Williams filed a flurry of motions, including a Motion for Evidentiary Hearing (ECF 13), Motion for First Request for Discovery (ECF 14), Motion for Evidentiary Hearing (Supplemental Filing) (ECF 19), and Motion to Expand the Record (ECF 26).[21] Respondent opposed the above motions (ECF 17, 18, and 25), and also filed a Motion to Strike LeCavalier Report (ECF 21).  Williams filed replies in support of his various motions, opposed Respondent's motion to strike, and supplemented his motion for discovery. (ECF 19, 20, 22, and 23). Respondent replied to Williams' opposition to her motion to strike. (ECF 24).

On September 23, 2011, the Court denied each of Williams' motions and granted Respondent's Motion to Strike. (ECF 27). The Court ruled that, as there was no dispute that Williams' *Atkins* claim had been adjudicated on the merits by the state courts, this Court's

---

[21]    In these Motions, Williams sought to depose MCI Death Row Case Manager Greg Morrow and prison psychologist Kenneth Covey. (ECF 14).  He also sought an evidentiary hearing, in which he intended to (among other things) introduce the report and testimony of psychologist Luc LeCavalier.  Dr. LeCavalier conducted an evaluation of Williams in November 2009 in which he (1) interviewed Williams for 5.5 hours; (2) administered an intelligence test; (3) measured Williams' adaptive functioning; (4) reviewed various records including Williams' school records, prison file, and Dr Eisenberg's report; and (5) interviewed several of Williams' family members.  (ECF 13 at 9-10). Dr. LeCavalier concluded, in a Report attached to Williams' Supplemental Filing in support of Motion for Evidentiary Hearing, that Williams was mentally retarded for *Atkins* purposes because he had a Full Scale IQ of 69 and significant limitations in several adaptive skill areas. (ECF 19). The State moved to strike Dr. LeCavalier's Report. (ECF 21).  Williams also supported his Motion for Evidentiary Hearing with affidavits from several death row inmates, who stated they had ghostwritten documents for Williams because of his inability to effectively communicate. (ECF 13). Later, Williams sought to expand the record with Mr. Morrow's deposition testimony in *Hill v. Anderson*, Case No. 96-795 (N.D. Ohio), as well as affidavits from two of Williams' family members. (ECF 26).

determination of Williams' claim was limited to the state court record pursuant to *Cullen v. Pinholster*, 131 S.Ct. 1388 (2011).[22] Williams filed a Motion for Reconsideration on October 13, 2011 (ECF 28), which the Court denied. (ECF 30). Nearly a year later, Williams filed another Motion for Reconsideration (ECF 32), arguing this Court should reconsider in light of the Supreme Court's recent decision in *Martinez v. Ryan*, 132 S.Ct. 1309 (2012). The Court denied this Motion as well.

## IV.    Standard of Review

### A.    AEDPA Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 (hereinafter the "AEDPA"), which amended 28 U.S.C. § 2254, was signed into law on April 24, 1996. The United States Supreme Court has held the provisions of the AEDPA apply to habeas corpus petitions filed after that effective date. *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997); *Woodford v. Garceau*, 538 U.S. 202, 210 (2003); *Barker v. Yukins*, 199 F.3d 867, 871 (6th Cir. 1999). Because Williams' Amended Petition was filed on October 13, 2009, well after the AEDPA's effective date, the AEDPA governs this Court's consideration of his Amended Petition.

The AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases, and 'to further the principles of comity, finality, and federalism.'" *Woodford,* 538 U.S. at 206 (quoting *Williams v. Taylor*, 529 U.S. 362, 436 (2000)). The requirements of the AEDPA "create an independent, high standard to be met before a federal court may issue a writ of habeas corpus to set aside state-court rulings." *Uttecht v. Brown*, 551 U.S.

---

[22]    In *Pinholster*, the Supreme Court held that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 131 S.Ct. at 1398.

1, 127 S.Ct. 2218, 2224 (2007) (citations omitted). As the Supreme Court recently explained, the AEDPA's requirements reflect "the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 131 S.Ct. 770, 786 (2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979)).

> Section 2254(d) provides:
>
> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). This is "a 'difficult to meet'. . . and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" *Pinholster*, 131 S.Ct. at 1398 (quoting *Harrington*, 131 S.Ct. at 786 and *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)). The Petitioner carries the burden of proof. *Pinholster*, 131 S.Ct. at 1398.

With respect to Section 2254(d)(1), "clearly established federal law" refers to the holdings (as opposed to dicta) of the United States Supreme Court's decisions as of the time of the relevant state court decision. *Williams*, 529 U.S. at 412; *Barnes v. Elo*, 231 F.3d 1025, 1028 (6th Cir. 2000). The "contrary to" and "unreasonable application" clauses of Section 2254(d)(1) are independent tests and must be analyzed separately. *Williams*, 529 U.S. at 412-13; *Hill v. Hofbauer*, 337 F.3d

706, 711 (6th Cir. 2003). A state court decision is "contrary to" federal law "only if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13.

Even if the state court identifies the "correct governing legal principle," a federal habeas court may still grant the petition if the state court makes an "unreasonable application" of "that principle to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 413. A state court decision involves an unreasonable application if it unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply. *Id.* at 407; *Hill*, 337 F.3d at 711. As the Supreme Court has advised, "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable– a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410). The reasonableness of the application of a particular legal principle depends in part on the specificity of the relevant rule. *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). While the application of specific rules may be plainly correct or incorrect, courts may have more leeway in reasonably applying more general rules in the context of a particular case. *Id.*

The Supreme Court recently emphasized the limited nature of review under Section 2254(d)(1) in *Pinholster, supra* and *Harrington, supra*. In *Pinholster*, the Court held that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits" and that "evidence introduced in federal court has no bearing on § 2254(d)(1)

review."[23] *Pinholster*, 131 S.Ct. at 1398, 1400. The Court further cautioned in *Harrington* that the AEDPA requires federal habeas courts to review state court decisions with "deference and latitude," and that "[a] state court's determination that a claim lacks merit precludes habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 131 S.Ct. at 786 (quoting *Yarborough*, 541 U.S. at 664).

The Supreme Court interpreted the "unreasonable determination of the facts" clause in Section 2254(d)(2) in *Wiggins v. Smith*, 539 U.S. 510 (2003). In that case, the Court noted that a "clear factual error" constitutes an "unreasonable determination of the facts in light of the evidence presented." *Id.* at 528-29. In other words, a state court's determination of facts is unreasonable if its findings conflict with clear and convincing evidence to the contrary. The Supreme Court recently emphasized, however, that "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion." *Wood v. Allen*, 558 U.S. 290, 130 S.Ct. 841, 849 (2010). Even if reasonable minds reviewing the record might disagree about the state-court factual finding in question, "on habeas review that does not suffice to supersede the trial court's credibility determination." *Rice v. Collins*, 546 U.S. 333, 341-42 (2006). "'The standard is demanding but not insatiable,' and the Supreme Court has noted that 'deference does not by definition preclude relief.'" *Titlow v. Burt*, 680 F.3d 577, 586 (6th Cir. 2012) (quoting *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005)).

---

[23]   In the instant case, it is undisputed that Williams' *Atkins* claims were "adjudicated on the merits" by the state courts for purposes of § 2254(d). Accordingly, pursuant to *Pinholster*, this Court is "limited to the record that was before the state court that adjudicated the claim on the merits" and may not consider any evidence that was introduced, or attempted to be introduced, in these federal proceedings. *Pinholster*, 131 S.Ct. at 1398, 1400.

By its express terms, however, Section 2254(d)'s constrained standard of review only applies to claims that were "adjudicated on the merits" in the state court proceeding. *Harrington*, 131 S.Ct. at 784. *See also Clinkscale v. Carter*, 375 F.3d 430, 436 (6th Cir. 2004). When a state court does not assess the merits of a petitioner's habeas claim, the deference due under the AEDPA does not apply. In such a case, the habeas court is not limited to deciding whether that court's decision was contrary to, or involved an unreasonable application of, clearly established federal law, but rather conducts a *de novo* review of the claim. *See Morales v. Mitchell*, 507 F.3d 916, 930 (6th Cir. 2007); *Newton v. Million*, 349 F.3d 873, 878 (6th Cir. 2003); *Maples v. Stegall*, 340 F.3d 433, 436-37 (6th Cir. 2003).

**B.  Exhaustion and Procedural Default**

**1.  Exhaustion**

A state prisoner must exhaust his state remedies before bringing his claim in a federal habeas corpus proceeding. 28 U.S.C. § 2254(b), (c); *Rose v. Lundy*, 455 U.S. 509 (1982). Exhaustion is fulfilled once a state supreme court provides a convicted defendant an opportunity to review his or her claim on the merits. *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999). A habeas petitioner satisfies the exhaustion requirement when the highest court in the state in which the petitioner has been convicted has had a full and fair opportunity to rule on the claims. *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994); *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990). If under state law there remains a remedy that a petitioner has not yet pursued, exhaustion has not occurred and the federal habeas court cannot entertain the merits of the claim. *Rust*, 17 F.3d at 160.

A petitioner "cannot obtain federal habeas relief under 28 U.S.C. § 2254 unless he has completely exhausted his available state court remedies to the state's highest court." *Buell v.*

-36-

*Mitchell*, 274 F.3d 337, 349 (6th Cir. 2001) (quoting *Coleman v. Mitchell*, 244 F.3d 533, 538 (6th Cir. 2001) (internal quotation marks omitted). Rather than dismiss certain claims the Court deems unexhausted, however, a habeas court need not wait for exhaustion if it determines that a return to state court would be futile. *Lott v. Coyle*, 261 F.3d 594, 608 (6th Cir. 2001). In circumstances where the petitioner has failed to present a claim in state court, a habeas court may deem that claim procedurally defaulted because the Ohio state courts would no longer entertain the claim. *Buell*, 274 F.3d at 349. To obtain a merit review of the claim, the petitioner must demonstrate cause and prejudice to excuse his failure to raise the claim in state court, or that a miscarriage of justice would occur were the habeas court to refuse to address the claim on its merits. *Seymour v. Walker*, 224 F.3d 542, 550 (6th Cir. 2000) (citing *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977)).

In the instant case, Respondent does not contend that Williams' claims are unexhausted.

### 2. Procedural Default

In general, a federal court may not consider "contentions of general law which are not resolved on the merits in the state proceeding due to petitioner's failure to raise them as required by state procedure." *Wainwright*, 433 U.S. at 87. If a "state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). To be independent, a state procedural rule and the state courts' application of it "must rely in no part on federal law." *Fautenberry v. Mitchell*, 2001 WL 1763438 at * 24 (S.D. Ohio Dec. 26, 2001) (citing *Coleman*, 501 U.S. at 732-33). To be adequate, a state procedural rule must be

-37-

"firmly established and regularly followed" by the state courts at the time it was applied. *Beard v. Kindler*, 130 S.Ct. 612, 618 (2009). If a petitioner fails to fairly present any federal habeas claims to the state courts but has no remaining state remedies, then the petitioner has procedurally defaulted those claims. *O'Sullivan*, 526 U.S. at 848; *Rust*, 17 F.3d at 160.

In *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986), the Sixth Circuit outlined the now familiar test to be followed when the state argues that a habeas claim is defaulted because of a prisoner's failure to observe a state procedural rule. It is:

> First, the federal court must determine whether there is a state procedural rule that is applicable to petitioner's claim and whether the petitioner failed to comply with that rule. Second, the federal court must determine whether the state courts actually enforced the state procedural sanction – that is, whether the state courts actually based their decisions on the procedural rule. Third, the federal court must decide whether the state procedural rule is an adequate and independent state ground on which the state can rely to foreclose federal review of a federal constitutional claim. Fourth, if the federal court answers the first three questions in the affirmative, it would not review the petitioner's procedurally defaulted claim unless the petitioner can show cause for not following the procedural rule and that failure to review the claim would result in prejudice or a miscarriage of justice.

*Williams v. Coyle*, 260 F.3d 684, 693 (6th Cir. 2001) (citing *Maupin*, 785 F.2d at 138) (further citations omitted).

In determining whether the *Maupin* factors are met, the federal courts look to the last explained state court judgment. *Ylst v. Nunemaker*, 501 U.S. 797, 805 (1991); *Combs v. Coyle*, 205 F.3d 269, 275 (6th Cir. 2000). "'[A] procedural default does not bar consideration of a federal claim on habeas corpus review unless the last state court rendering a reasoned opinion in the case clearly and expressly states that its judgment rests on a state procedural bar.'" *Morales v. Mitchell*, 507 F.3d 916, 937 (6th Cir. 2007) (quoting *Frazier v. Huffman*, 343 F.3d 780, 791 (6th Cir. 2003)).

-38-

Conversely, if the last state court to be presented with a particular federal claim reaches the merits, then the procedural bar is removed and a federal habeas court may consider the merits of the claim in its review. *Ylst*, 501 U.S. at 801.

If the three *Maupin* factors are met, the claim is procedurally defaulted. However, the federal court may excuse the default and consider the claim on the merits if the petitioner demonstrates that (1) there was cause for him not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error, or (2) a fundamental miscarriage of justice would result from a bar on federal habeas review. *Maupin*, 785 F.2d at 138; *Hutchison v. Bell*, 303 F.3d 720, 735 (6th Cir. 2002); *Combs*, 205 F.3d at 274-75.

A petitioner can establish cause in two ways. First, a petitioner may "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). *See also Coleman*, 501 U.S. at 753; *Maples v. Stegall*, 340 F.3d 433, 438 (6th Cir. 2003). Objective impediments include an unavailable claim, or interference by officials that made compliance impracticable. *Murray*, 477 U.S. at 488. Second, constitutionally ineffective assistance of counsel may constitute cause under certain circumstances. *Murray*, 477 U.S. at 488-89; *Broom v. Mitchell*, 441 F.3d 392, 401 (6th Cir. 2006); *Rust*, 17 F.3d at 161.

To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his actual and substantial disadvantage." *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)). *See also Ambrose v. Booker*, 684 F.3d 638, 649 (6th Cir. 2012) ("finding that "having shown cause, petitioners must show actual prejudice to excuse their default"). "When a petitioner fails to establish cause to excuse a procedural default,

a court does not need to address the issue of prejudice." *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000).

Because the cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the United States Supreme Court has recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense. *Dretke v. Haley*, 541 U.S. 386, 392 (2004) (citing *Murray*, 477 U.S. at 495-96). *See also Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006). When the Supreme Court extended this exception to claims of capital sentencing error, it limited the exception in the capital sentencing context to cases in which the petitioner could show "' by clear and convincing evidence that, but for constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law.'" *Dretke,* 541 U.S. at 392 (quoting *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992)).

In the instant case, Respondent does not argue that any of Williams' claims are procedurally defaulted.

V.  **Analysis**

    A.  **First Ground for Relief: "Mr. Williams is mentally retarded and thus ineligible for the death penalty. Mr. Williams' sentence of death violates his right to be free from cruel and unusual punishment as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution."**

Williams advances two primary arguments in support of his First Ground for Relief. First, he maintains the fact-finding procedures used by the Ohio courts to assess his *Atkins* claim lacked fairness and reliability and, therefore, constituted a violation of his due process rights contrary to clearly established federal law pursuant to § 2254(d)(1). (ECF 6 at 27 - 47; ECF 12 at 1). Second,

-40-

Williams argues the state courts' failure to conduct an evidentiary hearing and its factual determinations as to *Atkins'* three clinical criteria constitute unreasonable determinations of the facts in light of the evidence presented pursuant to § 2254(d)(2). (ECF 6 at 47-56; ECF 12 at 1). The Court will address each of these arguments in turn.

### 1. § 2254(d)(1): State Court Fact Finding Procedures

Williams argues the Ohio courts' determination that he is not mentally retarded for *Atkins* purposes violates due process because the fact finding procedures underlying this determination did not satisfy the "heightened standard of reliability" required under federal law. Although *Atkins* itself does not require any specific due process protections, Williams argues the Supreme Court's discussion of this issue in *Ford v. Wainwright*, 477 U.S. 399 (1986) extends to determinations of mental retardation under *Atkins* and imposes an obligation on state courts to provide prisoners with a "full and fair hearing." Williams maintains the Ohio courts' adjudication of his *Atkins* claim failed to satisfy this standard and was, thus, contrary to clearly established federal law pursuant to § 2254(d)(1).

Specifically, Williams maintains the state courts' use of the summary judgment process to adjudicate his *Atkins* claim was improper because summary judgment is a "rudimentary process" that is "void of any guarantees afforded by an adversarial hearing, such as confronting and cross examining witnesses to question their credibility." (ECF 6 at 32, 34). He asserts the trial court impermissibly weighed conflicting affidavits rather than resolving alleged credibility issues and material factual disputes through an evidentiary hearing. He maintains the trial court failed to satisfy its "gatekeeping function" with respect to Dr. Eisenberg and argues there is no evidence Dr. Eisenberg was qualified and competent to render his conclusion that Williams was not mentally

retarded.  He asserts the trial court erred as a matter of law in failing to take into account the effect

of the standard error measurement (SEM) and the Flynn effect[24] in considering whether Williams'

IQ scores satisfied the *Atkins/Lott* criteria of significant sub-average intelligence.  Williams also

claims his due process rights were violated because the trial court failed to appoint two attorneys

to represent him and, further, because the attorney he did have during his state court *Atkins* litigation

rendered ineffective assistance of counsel.  Finally, Williams maintains his equal protection rights

were violated because he was afforded less due process protections than other death row inmates

whose convictions and sentences post-date the *Atkins* decision.  Based on the above, Williams

argues this Court should afford no deference to the state courts' factual determinations and should,

instead, conduct a *de novo* review to find that he is mentally retarded for *Atkins* purposes.

Respondent argues generally that the state courts' findings are reasonable and entitled to

deference.[25]  She asserts that state courts are not required, as a matter of federal law, to conduct an

evidentiary hearing on all *Atkins* petitions.  Rather, she maintains, the Ohio courts were permitted

to set a high threshold to warrant an evidentiary hearing on Williams' petition.  Because Williams

failed to present sufficient evidence in support of his *Atkins* petition to meet this threshold,

Respondent argues, the state courts did not violate Williams' due process rights by failing to

conduct an evidentiary hearing on his petition.  Accordingly, Respondent argues the state courts'

finding of fact that Williams failed to demonstrate *Atkins* eligibility is entitled to deference and,

---

[24]    The standard error measurement, or SEM, refers to a measurement error of
approximately five points in assessing IQ.  The Flynn effect describes the phenomenon in
which IQ scores tend to rise over time, requiring tests to be renormed.

[25]    Respondent's Return was four pages in length and failed to address many of the
specific arguments raised by Williams in his Petition. (ECF 10).

further, is within the range of reasonableness based upon the evidence in the state court record. (ECF 10).

In *Atkins v. Virginia*, 536 U.S. 304 (2002), the United States Supreme Court held that executing a mentally retarded offender violates the Eighth Amendment's ban on cruel and unusual punishment. *Id.* at 321. The Court recognized a national consensus that mentally retarded persons are less culpable and more prone to wrongful execution. *Id.* at 318-21. Recognizing that there is disagreement in determining which offenders are in fact retarded, the Court noted that "[n]ot all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus." *Id.* at 317. Accordingly the Court entrusted the States with "the task of developing appropriate ways to enforce the constitutional restriction" upon the execution of their sentences. *Id.* (quoting *Ford v. Wainwright*, 477 U.S. 399, 416-17 (1986)).[26]

Six months later, in *State v. Lott*, 97 Ohio St.3d 303 (2002), the Ohio Supreme Court addressed the substantive standards and procedural guidelines that Ohio courts should use in determining whether a defendant is ineligible for execution under *Atkins*. Specifically, that court held that:

> Clinical definitions of mental retardation, cited with approval in *Atkins*, provide a standard for evaluating an individual's claim of mental retardation. [*Atkins*, 536 U.S. at] fn 3, citing definitions from the American Association of Mental Retardation and the American Psychiatric Association. These definitions require (1) significantly subaverage intellectual functioning; (2) significant limitations in two or more adaptive skills, such as communication, self-care, and self-direction, and (3) onset before the age of 18. Most state statutes prohibiting the

---

[26]    Prior to *Atkins*, the Supreme Court had determined that mental retardation merited consideration as a mitigating factor but did not bar imposition of the death penalty. *See Penry v. Lynaugh*, 492 U.S. 302 (1989).

> execution of the mentally retarded require evidence that the individual has an IQ of 70 or below. [citations omitted].  While IQ tests are one of the many factors that need to be considered, they alone are not sufficient to make a final determination on this issue. *Murphy v. State*, 54 P.3d 556, 568, 2002 OK CR 32 at ¶ 29.  We hold that there is a rebuttable presumption that a defendant is not mentally retarded if his or her IQ is above 70.

*Id.* at 305. The court further explained that, for those offenders whose convictions and sentences pre-dated *Atkins*, the procedures for post-conviction relief set forth in Ohio Rev. Code 2953.21 *et seq.* provided a "suitable statutory framework" for reviewing their *Atkins* claims. *Id.*  The court instructed trial courts in such cases to consider a defendant's *Atkins* petition as a first, rather than successive, petition and to decide whether the defendant is mentally retarded by using a preponderance-of-the-evidence standard. *Id.* at 306.

In addition, the Ohio Supreme Court explained that, in considering an *Atkins* claim, a trial court "shall conduct its own *de novo* review of the evidence" and should rely on professional evaluations and expert testimony, "appointing experts, if necessary, in deciding this matter." *Id.* The court emphasized that "these matters should be decided by the court and do not represent a jury question," noting that "a trial court's ruling on mental retardation should be conducted in a manner comparable to a ruling on competency (i.e. the judge, not the jury, decides the issue)." *Id.*  Finally, the court noted that the defendant "bears the burden of establishing that he is mentally retarded by a preponderance of the evidence." *Id.* at 307.

The United States Supreme Court has continued to emphasize that the States bear responsibility for developing appropriate procedures to determine *Atkins* ineligibility. In *Bobby v. Bies*, 556 U.S. 825, 831 (2009), the Court expressly noted that "[o]ur opinion [in *Atkins*] did not provide definitive procedural or substantive guides for determining when a person who claims

-44-

mental retardation will be so impaired as to fall [within *Atkins'* compass]." Rather, the Court

explained, "[w]e left to the States the task of developing appropriate ways to enforce the

constitutional restriction." *Id.* (quoting *Atkins*, 536 U.S. at 317). Further, in *Schriro v. Smith*, 546

U.S. 6 (2005), the Court reversed a decision by the Ninth Circuit which, in ordering petitioner to

institute state court proceedings to resolve the issue of his *Atkins* ineligibility, expressly required

the state courts to conduct a jury trial to determine the issue of whether petitioner is mentally

retarded. The Court explained:

> The Ninth Circuit erred in commanding the Arizona courts to conduct a jury trial
> to resolve Smith's mental retardation claim. *Atkins* stated in clear terms that "'we
> leave to the State[s] the task of developing appropriate ways to enforce the
> constitutional restriction upon [their] execution of sentences.'" 536 U.S. at 317,
> 122 S.Ct. 2242 (quoting *Ford v. Wainwright*, 477 U.S. 399, 416-17, 106 S.Ct.
> 2595, 91 L.Ed.2d 335 (1986)); modifications in original). States, including
> Arizona, have responded to that challenge by adopting their own measures for
> adjudicating claims of mental retardation. **While those measures might, in
> their application, be subject to constitutional challenge**, Arizona had not even
> had a chance to apply its chosen procedures when the Ninth Circuit preemptively
> imposed its jury trial condition.

*Id.* at 9 (emphasis added).

Williams' due process argument herein constitutes the type of constitutional challenge

hinted at by the Supreme Court in *Schriro*. As set forth *supra*, Williams argues the measures used

by the Ohio courts in his case to determine whether he is ineligible for execution under *Atkins*

violate due process and are, therefore, subject to constitutional challenge. Specifically, Williams

objects to the State courts' failure to (1) conduct an evidentiary hearing; (2) appoint two attorneys

to represent him; (3) ensure that Dr. Eisenberg was competent and qualified to render an opinion

regarding mental retardation; and (4) provide a procedural mechanism for him to raise the issue of

ineffective assistance of his *Atkins* post-conviction counsel.

-45-

The United States Supreme Court has not expressly defined the due process protections required for determinations of mental retardation under *Atkins*. The *Atkins* decision itself does not directly address this issue, nor do the Courts' decisions in *Bobby v. Bies*, 556 U.S. 825 (2009) or *Schriro v. Smith*, 546 U.S. 6 (2005). Williams argues that the Supreme Court's decision in *Ford v. Wainwright*, 477 U.S. 399 (1986) provides guidance on this issue. In *Ford*, the petitioner was convicted of murder and sentenced to death in Florida. In the years following his conviction and sentence, Ford began to manifest gradual changes in behavior that became more severe over time, culminating in extreme delusions and regression into "nearly complete incomprehensibility." *Id.* at 403. He was ultimately diagnosed as paranoid schizophrenic. *Id.* Ford's counsel requested the State determine his competency and, pursuant to the procedures established by Florida law, the Governor appointed a panel of three psychiatrists to examine him. *Id.* at 404. These psychiatrists jointly interviewed Ford for approximately 30 minutes. *Id.* Each then produced a short report concluding he had some form of psychosis but was competent to understand the death penalty and its consequences. *Id.* Without explanation, the Governor subsequently signed Ford's death warrant. *Id.* Ford's attorneys then unsuccessfully sought a hearing in state court to determine anew Ford's competency. *Id.* On habeas review, the federal courts denied his request for an evidentiary hearing and dismissed his petition. *Id.*

The Supreme Court granted Ford's petition for certiorari to address the issue of "whether the Eighth Amendment prohibits the execution of the insane and, if so, whether the District Court should have held a hearing on petitioner's claim." *Id.* at 405. In considering the first issue, the Court explained that since "the Eighth Amendment has been recognized to affect significantly both the procedural and substantive aspects of the death penalty," the adequacy of the procedures chosen

-46-

by a State to determine sanity rested on "whether the Constitution places a substantive restriction on the State's power to take the life of an insane prisoner." *Id*. at 405. After reviewing the historical practice at common law of barring the execution of the insane and the "evolving standards of decency" reflected in emerging State laws regarding this issue, the Court concluded the Eighth Amendment did indeed prohibit the execution of the insane. *Id*. at 406-410.

Having so determined, the Court then turned to the question of "whether the District Court was under an obligation to hold an evidentiary hearing on the question of Ford's sanity." *Id*. at 410. Because a federal court is obliged to hold an evidentiary hearing on habeas corpus if, among other things, the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing, the Court looked to the adequacy of Florida's procedure to determine Ford's sanity. The plurality held:

> The adequacy of a state-court procedure . . . is largely a function of the circumstances and the interests at stake. In capital proceedings generally, this Court has demanded that factfinding procedures aspire to a heightened standard of reliability. This especial concern is a natural consequence of the knowledge that execution is the most irremediable and unfathomable of penalties; that death is different.
>
> Although the condemned prisoner does not enjoy the same presumptions accorded a defendant who has yet to be convicted or sentenced, he has not lost the protection of the Constitution altogether; if the Constitution renders the fact or timing of his execution contingent upon establishment of a further fact, then that fact must be determined with the high regard for truth that befits a decision affecting the life or death of a human being. Thus, the ascertainment of a prisoner's sanity as a predicate to lawful execution calls for no less stringent standards than those demanded in any other aspect of a capital proceeding.

*Id*. at 411-12 (internal quotations and citations omitted). Under this standard, the plurality found that Florida's procedures for determining Ford's sanity "d[id] not fare well" because they failed to include Ford in the "truth-seeking process" and denied him the opportunity to challenge or impeach

-47-

the state-appointed psychiatrists' opinions. *Id.* at 414-15. In so holding, however, the plurality noted that "[w]e do not suggest here that only a full trial on the issue of sanity will suffice." *Id.* at 416. Rather, the plurality left to the State the task of developing "appropriate ways" to enforce the constitutional restriction, noting that "[i]t may be that some high threshold showing on behalf of the prisoner will be found a necessary means to control the number of nonmeritorious or repetitive claims of insanity." *Id.* at 417.

In his concurring opinion, Justice Powell found that "[i]t is clear that an insane defendant's Eighth Amendment interest in forestalling his execution unless or until he recovers his sanity cannot be deprived without a 'fair hearing.'" *Id.* at 424. While finding that the procedures followed by Florida did not "comport with basic fairness," Justice Powell explained that "[d]ue process is a flexible concept, requiring only 'such procedural protections as the particular situation demands.'" *Id.* at 425 (quoting *Matthews v. Eldredge*, 424 U.S. 319, 334 (1976)). Accordingly, he concluded that:

> We need not determine the precise limits that due process imposes in this area. In general, however, my view is that a constitutionally acceptable procedure may be far less formal than a trial. The State should provide an impartial officer or board that can receive evidence and argument from the prisoner's counsel, including expert psychiatric evidence that may differ from the State's own psychiatric examination. Beyond these basic requirements, the States should have substantial leeway to determine what process best balances the various interests at stake. As long as basic fairness is observed, I would find due process satisfied and would apply the presumption of correctness of § 2254(d) on federal habeas corpus.

*Id.* at 427. Because there was no majority opinion on this issue of the adequacy of state-court procedure, Justice Powell's more limited holding controls. *Panetti*, 551 U.S. at 949 (recognizing that Justice Powell's concurring opinion in *Ford* constitutes "clearly established federal law" for

purposes of § 2254).

In *Panetti v. Quarterman*, 551 U.S. 930 (2007), the Supreme Court again considered the issue of the procedural protections afforded prisoners seeking to demonstrate insanity under *Ford*. In that case, the Court explained that:

> Justice Powell's opinion states the relevant standard as follows. Once a prisoner seeking a stay of execution has made 'a substantial threshold showing of insanity,' the protection afforded by procedural due process includes a 'fair hearing' in accord with fundamental fairness. This protection means a prisoner must be accorded an 'opportunity to be heard,' though 'a constitutionally acceptable procedure may be far less formal than a trial.'

*Id.* at 949. The Court determined that petitioner "was entitled to these protections once he had made a 'substantial threshold showing of insanity.'" *Id.* at 950 (quoting *Ford*, 477 U.S. at 426).

The Sixth Circuit has not explicitly addressed whether or to what extent *Ford*'s due process requirements extend to state courts' determinations of mental retardation under *Atkins*. Several other Circuit Courts of Appeals, however, have addressed this issue. The Fifth and Tenth Circuits have recognized that the due process protections embodied in the Fourteenth Amendment are applicable to *Atkins* proceedings. Specifically, the Fifth Circuit has held that "*Atkins* created and protects a significant substantive liberty interest, a liberty interest that entitles the petitioner to a set of core procedural due process protections: the opportunity to develop and be heard on his claim that he is ineligible for the death penalty." *Blue v. Thaler*, 665 F.3d 647 (5th Cir. 2011). *See also Rivera v. Quarterman*, 505 F.3d 349, 358 (5th Cir. 2007) (noting that "[e]ven though *Atkins* did not specifically mandate any set of procedures, it was decided against the backdrop of the Supreme Court's and lower court's due process jurisprudence"). The Tenth Circuit has reached a similar conclusion, at least with respect to Oklahoma's decision to provide jury trials for determining *Atkins*

-49-

claims. *See Ochoa v. Workman*, 669 F.3d 1130, 1143 (10th Cir. 2012) (finding that the Fourteenth Amendment due-process protections are applicable in an *Atkins* proceeding because "Oklahoma adopted the jury trial, with its historically attendant procedural protections, as the method to vindicate" the right of the mentally retarded to avoid execution); *Hooks v. Workman*, ---- F.3d -----, 2012 WL 3140916  (10th Cir. Aug. 3, 2012) (same).

The Eleventh Circuit, on the other hand, has found that *Atkins* did not establish any specific procedural due process requirements and, further, that the holdings of *Ford* and *Panetti* cannot be used to "import" such requirements into the *Atkins* decision. *See Hill v. Humphrey*, 662 F.3d 1335, 1360 (11th Cir. 2011) (distinguishing *Ford* and *Panetti* and holding that "[h]ere, by contrast, *Atkins* established only a substantive Eighth Amendment right for the mentally retarded, not any minimum procedural due process requirements for bringing that Eighth Amendment claim"); *Carroll v. Secretary*, DOC, Fl., 574 F.3d 1354, 1366 (11th Cir. 2009) (denying petitioner's claim that state court's failure to conduct evidentiary hearing violated his due process rights because "Carroll points to no language in *Atkins*, or any other decision of the Supreme Court or this Court, to support his argument that *federal* law requires state courts to conduct evidentiary hearings on every claim of mental retardation").

This Court need not decide this issue at this time. Even assuming the due process considerations discussed in *Ford* and *Panetti* apply to Williams' *Atkins* claim, the Court finds the Ohio courts' adjudication of Williams' *Atkins* claim did not violate due process.[27]  As Justice

---

[27]  While arguing in the Petition that the due process protections embodied in *Ford* and *Panetti* are applicable to his *Atkins* claim, Williams argues for the first time in his Traverse that, in fact, the due process procedures required for assessing insanity under *Ford* "are considerably *less* than the heightened reliability required when addressing" an *Atkins* claim. (ECF 12 at 13.)  He maintains the trial court "misunderstood that the substantive *Atkins* right

Powell explained in his concurring opinion in *Ford,* the fundamental question is whether the Ohio courts' procedures comported with "basic fairness." *Atkins,* 536 U.S. at 427. Justice Powell specified only that the State "should provide an impartial officer or board that can receive evidence and argument from the prisoner's counsel, including expert psychiatric evidence that may differ from the State's own psychiatric examination." *Id.* As due process is a "flexible concept," Justice Powell expressly declined to impose anything beyond these "basic requirements." *Id.* The Fifth Circuit has interpreted this to mean, generally, that the state courts must provide the prisoner with the "opportunity to develop and be heard on his [*Atkins*] claim." *Blue,* 665 F.3d at 657.

The Court finds the Ohio courts provided Williams the opportunity to develop and be heard on his *Atkins* claim. Unlike the defendant in *Ford* whose insanity claim was determined solely by the Governor without any input from Ford's counsel, Williams' *Atkins* claim was determined by the state trial court after extensive briefing, expert evaluation, and (at Williams' request) the admission of voluminous documentation from the prison regarding Williams' incarceration. The state trial court appointed counsel for Williams and received and considered evidence from Williams supporting his *Atkins* claim. The court granted Williams' motion seeking the appropriation of funds to hire an expert and, further, authorized Williams to retain the expert of his choice, Dr. James Eisenberg. (Suppl. Appx. Disc 1 at 708-710). There is no suggestion the trial court failed to give Dr. Eisenberg an adequate opportunity to conduct his examination. To the

_____

being protected by the state required enhanced reliability procedures [over and above that set out in *Ford*] to meet constitutional due process standards." (ECF 12 at 13, fn 5). Williams cites no authority for the proposition that the due process standards set forth in Justice Powell's concurring opinion in *Ford* should be "enhanced" for purposes of determining *Atkins* claims. The Court finds Williams' novel interpretation of *Ford* and *Atkins* as imposing unidentified "enhanced" due process standards on state trial courts does not qualify as "clearly established federal law" for purposes of § 2254(d)(1).

contrary, the record reflects the trial court expressly ordered that Dr. Eisenberg be given access to Williams at MCI to conduct his examination and, further, that Williams' prison records be temporarily released to Williams' counsel and provided to Dr. Eisenberg for his review. (Suppl. Appx. Disc. 1 at 709, 711-12).

Williams fully opposed the State's Motion to Dismiss, arguing at length against the State's characterization of the evidence. In support of his Opposition, Williams presented additional evidence for the trial court's consideration, including the expert report of Dr. Eisenberg and the entirety of Williams' prison file. (Suppl. Appx. Disc 1 at 716 - 49; Suppl. Appx. Disc 2 at 2829). Williams does not argue the trial court provided him with insufficient time or opportunity to oppose the State's motion. Nor does Williams argue the trial court prevented him from obtaining additional evidence to support his *Atkins* claim. There is no indication in the state court record that Williams requested further psychological testing of Williams, or otherwise requested and was denied additional expert resources to pursue his *Atkins* claim.

In accordance with the procedure set forth by the Ohio Supreme Court in *Lott,* the trial court properly considered Williams' *Atkins* petition within the procedural context of a post-conviction review pursuant to Ohio Rev. Code 2953.21 *et seq. See Lott*, 97 Ohio St.3d at 305. The court issued a twenty-five page Opinion on remand from the state appellate court, in which it set forth a detailed discussion of its consideration of the evidence and reasons for granting summary judgment to the State. (Suppl. Appx. Disc 2 at 2826-50). Williams was provided with appointed counsel to appeal this decision, and the record reflects his appellate counsel filed lengthy and detailed briefs advocating Williams' position. (Suppl. Appx. Disc. 2 at 2894- 2931). After the appellate court affirmed the trial court's decision, Williams was again provided with appointed counsel to appeal

-52-

to the Ohio Supreme Court and, again, the record reflects that his counsel vigorously advocated Williams' position on appeal. (Suppl. Appx. Disc 2 at 2989- 3004).

In light of the above, this Court finds the fact-finding procedures used by the Ohio courts to adjudicate Williams' *Atkins* claim comported with due process and were not contrary to clearly established federal law pursuant to § 2554(d)(1). In accordance with Justice Powell's opinion in *Ford*, Williams' *Atkins* claim was decided by an "impartial officer" (i.e. the state trial court) that received evidence and argument from Williams' appointed counsel, including an evaluation from an expert of Williams' own choosing. The Court finds Williams was given an adequate opportunity to be heard.

In his Petition and Traverse, Williams identifies a number of specific deficiencies in the state courts' fact-finding procedures that he claims deprived him of due process. For the reasons set forth below, the Court finds each of Williams' arguments to be without merit.

### a.    Failure to Conduct an Evidentiary Hearing

Williams argues at length that he was deprived of a full and fair opportunity to present his *Atkins* claim because the state trial court failed to conduct an evidentiary hearing to resolve issues of credibility and material factual disputes regarding Williams' alleged mental retardation. The Court disagrees. As an initial matter, Williams cites no authority for the proposition that state trial courts are required under federal law to conduct evidentiary hearings on all *Atkins* claims of mental retardation. *Atkins* itself sets forth no such requirement, leaving it to the States to develop "appropriate ways to enforce the constitutional restriction" upon the execution of their sentences. *Atkins*, 536 U.S. at 317. *See also Bobby*, 556 U.S. at 831 (noting that "[o]ur opinion [in *Atkins*] did not provide definitive procedural or substantive guides for determining" *Atkins* ineligibility).

-53-

Indeed, Circuit Courts to consider the issue have expressly held that *Atkins* does not require state courts to conduct evidentiary hearings on all claims of mental retardation. *See, e.g. Blue*, 665 F.3d at 657 (although recognizing that *Atkins* created a significant liberty interest entitling petitioner to a set of core procedural due process protections, Fifth Circuit states that "[t]his does not mean that states must give hearings to all persons with *Atkins* claims"); *Carroll*, 574 F.3d at 1366 (stating that "Carroll points to no language in *Atkins*, or any other decision of the Supreme Court or this Court, to support his argument that federal law requires state courts to conduct evidentiary hearings on every claim of mental retardation").

Even assuming the due process protections discussed in *Ford* and *Panetti* extend to *Atkins* claims, neither of those decisions can reasonably be interpreted to mandate state court evidentiary hearings on all *Atkins* claims. Justice Powell certainly did not recognize such a requirement in the context of *Ford* insanity claims and even the broader, plurality decision in *Ford* stopped short of requiring a "full trial on the issue of sanity." *Ford,* 477 U.S. at 416-17, 427. To the contrary, the *Ford* plurality explicitly recognized that "[i]t may be some high threshold showing on behalf of the prisoner will be found a necessary means to control the number of nonmeritorious or repetitive claims of insanity." *Id.* at 417. *Panetti* similarly found that a prisoner is entitled to the procedural due process protections identified in *Ford* "**once he had made a 'substantial threshold showing of insanity.**'" *Panetti*, 551 U.S. at 950 (quoting *Ford*) (emphasis added). *See also Bedford v. Bobby*, 645 F.3d 372, 380 (6th Cir. 2011) ( finding that "nothing in Justice Powell's concurrence requires a full hearing as a part of a threshold determination of probable cause of insanity"and "[a] claimant is entitled to additional procedures once he has made a 'substantial' showing of insanity, not merely because he has shown a conflict in the record").

In Ohio, prisoners such as Williams are not automatically entitled to an evidentiary hearing on their *Atkins* claims. As set forth *supra*, *Lott* held that, for those prisoners whose convictions and sentences pre-date *Atkins*, the procedures for post-conviction relief in Ohio Rev. Code 2953.21 *et seq.* provided a "suitable statutory framework" for reviewing their claims of mental retardation. *Lott*, 97 Ohio St.3d at 305. Under Section 2953.21(C) of this framework, state trial courts are instructed that "[b]efore granting a hearing on a petition * * * , the court shall determine whether there are substantive grounds for relief." Ohio Rev. Code 2953.21 (C). "Substantive grounds for relief" exist and a hearing is warranted only if the petitioner (1) submits evidentiary documents containing sufficient operative facts demonstrating a violation of his constitutional rights, and (2) demonstrates that the claimed errors resulted in prejudice. *See State v. Calhoun*, 86 Ohio St.3d 279, 282-83 (1999); *State v. Jackson*, 64 Ohio St.2d 107, 112 (1980).

Thus, Ohio law provides that prisoners such as Williams must first satisfy a threshold evidentiary showing of mental retardation before a trial court is required to conduct an evidentiary hearing on an *Atkins* claim. This conclusion is consistent with the clear language of *Atkins*, *Ford* and *Panetti* and there is nothing to suggest that, on its face, Ohio's post-conviction procedures for determining *Atkins* claims violate federal due process principles.

Williams argues, however, that Ohio's fact-finding procedures for determining *Atkins* ineligibility violated due process as applied *to him*. Specifically, he maintains that he submitted "substantial *prima facie* evidence" of mental retardation that warranted an evidentiary hearing, including the Vail Affidavit, his school records, and his three previous IQ tests. He also maintains that, despite the fact that Dr. Eisenberg concluded Williams was not mentally retarded, Dr. Eisenberg's report nevertheless supports Williams' claim that he suffers from sub-average

-55-

intellectual functioning when the SEM and Flynn Effect are taken into account.  In denying his

petition without a hearing, Williams also maintains the state courts (1) improperly determined that

the Vail Affidavit lacked credibility; (2) placed improper weight on Greg Morrow's Affidavit and

Dr. Covey's Interoffice Memorandum, which indicated that Williams was not mentally retarded;

and (3) placed improper weight on unauthenticated documents allegedly written by Williams during

his incarceration. Based on the above, Williams argues the state courts' dismissal of his *Atkins*

petition without a hearing violates due process and is contrary to clearly established federal law.

The Court is not persuaded that the state courts' decision to deny Williams' *Atkins* petition

without an evidentiary hearing was based on an improper weighing of the evidence or otherwise

violated principles of "basic fairness."[28]  The state appellate court's June 30, 2008 Opinion

affirming the trial court's dismissal of Williams' petition is the last reasoned state court decision

to consider Williams' *Atkins* claim.[29]  In that Opinion, the court explained that "[a]s recently

emphasized by the Ohio Supreme Court, the definition of retardation adopted by *Lott* contemplates

---

[28]    In considering this argument under § 2254(d)(1), the Court considers whether the
state courts' application of its post-conviction standards in denying Williams' request for a
hearing violated due process principles.  Specifically, the Court considers whether the state
courts improperly weighed conflicting evidence in alleged violation of Williams' due
process rights and, if so, whether the state courts' refusal to conduct an evidentiary hearing is
therefore contrary to clearly established federal law pursuant to § 2254(d)(1).  In Section
V.B of this Opinion, the Court considers whether the state courts' factual determination that
Williams is not mentally retarded for *Atkins* purposes was unreasonable in light of the
evidence presented pursuant to § 2254(d)(2).

[29]    The three state appellate judges each wrote separate opinions regarding the trial
court's dismissal of Williams' petition. Two of these judges, Judges Grendell and Trapp,
agreed the trial court's judgment should be affirmed, but disagreed as to the proper appellate
standard of review. In his Petition and Traverse, Williams bases his arguments regarding the
reasonableness of the state court's decision on the opinion written by Presiding Judge
Grendell. Respondent does not object. This Court will, therefore, construe Judge Grendell's
opinion as the last reasoned state court decision regarding Williams' *Atkins* petition.

-56-

'substantial limitations in **present functioning**.'" *State v. Williams*, 2008 WL 2582849 at * 6 (Ohio App. 11ᵗʰ Dist. June 27, 2008)(emphasis in original)(quoting *State v. White*, 118 Ohio St.3d 12, ¶ 6 (2008)).[30] The court then specifically referenced Dr. Eisenberg's report, noting that "[t]he only recent psychological evaluation of Williams, conducted by a psychologist of his own choosing, concluded 'with reasonable psychological certainty' that Williams 'does not currently meet the criteria for a diagnosis of mental retardation based on the *Lott* definition.'" *Id.* In particular, the court noted that, using the WAIS-III test, Dr. Eisenberg determined Williams to have a full scale IQ of 75, "at which score he is rebuttably presumed not be mentally retarded." *Id.* The court further found that Williams' school records, three previous IQ evaluations (two of which were above 70), and the affidavit of Ms. Vail, "only attest his intellectual capacity and functioning prior to 1989" and "do not constitute competent evidence from which inferences may be made regarding his present mental capacity." *Id.* Based on the above, the appellate court determined that Williams had failed to raise a genuine issue of material fact that he has present significant sub-average intellectual functioning under the standards set forth by the Ohio Supreme Court. *Id.*

The Court finds the state appellate court did not improperly weigh the evidence in reaching

---

[30]  In *White*, the Ohio Supreme Court noted that "'[c]linical definitions of mental retardation, cited with approval in *Atkins*, provide a standard for evaluating an individual's claim of mental retardation.'" *White*, 118 Ohio St.3d at 13 (quoting *Lott*, 97 Ohio St.3d at 305). That court then quoted the American Association of Mental Retardation's ("AAMR") definition of mental retardation as "'substantial limitations in **present** functioning.'" *Id.* at 13 (emphasis added). This AAMR definition is cited with approval in *Atkins*. *See Atkins*, 536 U.S. at 308. Williams does not argue the state appellate court applied the incorrect legal standard in this respect or that the "present functioning" requirement set forth in *White* is contrary to clearly established federal law for purposes of § 2254(d)(1). Indeed, Williams argues throughout his Petition and Traverse that "accurately assessing mental retardation necessarily requires adherence to the clinical and operational definitions of the AAMR" and the American Psychiatric Association ("APA"). (ECF 12 at 24).

-57-

this conclusion. Williams' own expert determined Williams had a full scale IQ of 75 and, further,

that he was not mentally retarded under the standards set forth in *Atkins* and *Lott*.[31]  Williams

presented no other expert evidence regarding his present intellectual functioning. Moreover, given

that Williams' early school records and three previous IQ scores dated from 1973, 1978, and 1983,

it was not unreasonable for the state appellate court to conclude that these sources did not constitute

competent evidence of Williams' "present intellectual functioning." Similarly, in her Affidavit, Ms.

Vail expressly states that she knew Williams "from his early pre-school years until the date of his

. . . conviction" in 1989.  In light of this statement, it was not unreasonable for the state appellate

court to determine that Ms. Vail's Affidavit was relevant only to his intellectual functioning prior

to 1989.[32]

    In assessing this criteria under *Atkins*, then, the state appellate court did not improperly

weigh conflicting IQ scores or contradictory expert reports. Rather, it recognized that the only

evidence presented by Williams regarding his current intellectual functioning was his own expert's

report, which concluded that he had a full scale IQ of 75 and was not mentally retarded for *Atkins*

purposes. The Court finds this determination does not constitute an inappropriate weighing of

---

[31]    Williams failed to present any expert evidence that this IQ score should be adjusted
downward based on the SEM and Flynn Effect.  In the absence of this evidence, and for the
reasons set forth *infra* in Section V.A.1.e of this Opinion, the Court finds the state courts'
failure to consider evidence of the SEM and Flynn Effect was not contrary to clearly
established federal law for purposes of § 2254(d)(1).

[32]    Williams argues that the state court unreasonably failed to consider Ms. Vail's
Affidavit as anecdotal evidence of "chronic" subaverage intellectual functioning.  The Court
disagrees.  Ms. Vail does not aver that Williams was ever diagnosed as mentally retarded or
that she herself is capable of rendering such a diagnosis.  In light of Dr. Eisenberg's report
and conclusions, the Court finds the state court was not unreasonable in determining Ms.
Vail's general averment that Williams was "severely challenged in a mental capacity" was
insufficient to create a genuine issue of material fact on this issue.

conflicting evidence or otherwise violate Williams' due process rights.

In *Lott*, the Ohio Supreme Court found that a prisoner claiming mental retardation under *Atkins* must demonstrate **each** of the following three criteria: "(1) significantly subaverage intellectual functioning; (2) significant limitations in two or more adaptive skills, such as communication, self-care, and self-direction, **and** (3) onset before the age of 18." *Lott*, 97 Ohio St.3d at 305 (emphasis added). In order to obtain a hearing on the issue of his mental retardation, then, Williams bore the burden of submitting evidentiary documents containing sufficient operative facts demonstrating each of these three criteria. *See Lynch v. Hudson*, 2011 WL 4537890 at * 41 (S.D. Ohio Sept. 28, 2011) (applying Ohio law, finding that "[a] finding of mental retardation requires meeting all three criteria" set forth in *Lott*). Accordingly, the state court's conclusion that Williams failed to present sufficient evidence demonstrating a genuine issue of material fact regarding the first *Atkins* criteria (i.e. "significant sub-average intellectual functioning") was, in and of itself, sufficient to warrant dismissal of Williams' petition without a hearing.

In light of the above, therefore, the Court finds the state courts' failure to conduct an evidentiary hearing on Williams' *Atkins* claim did not violate due process and was not contrary to clearly established federal law for purposes of § 2254(d)(1).

        **b.**     **Uncertainty Regarding Use of Summary Judgment Procedure**

Williams next argues the state courts' use of the summary judgment procedure to dismiss his *Atkins* petition violated his due process rights in light of the state courts' confusion and uncertainty regarding how to apply summary judgment standards in the post-conviction context. In support of this argument, Williams emphasizes that the appellate court initially reversed the dismissal of his *Atkins* petition because the trial court "confused the distinction between the

-59-

dismissal of Williams' petition without hearing and the granting of summary judgment in the State's favor." (Suppl. Appx. Disc 2 at 2682).  After the trial court on remand again dismissed Williams' petition without a hearing, the three judges on the appellate court panel disagreed regarding the proper appellate standard of review. Presiding Judge Grendell upheld the trial court's summary dismissal under a *de novo* standard of review.  (Suppl. Appx. Disc 2 at 2959).  Judge Trapp concurred in judgment only, arguing that an abuse of discretion standard of review should be applied. (Suppl. Appx. Disc 2 at 2974).  Finally, Judge O'Toole dissented and maintained that, given the nature of the right implicated by *Atkins*, an evidentiary hearing was required to determine whether Williams was mentally retarded for *Atkins* purposes. (Suppl. Appx. Disc 2 at 2976).

Williams argues the trial court's uncertainty as to the appropriate standard to be applied in reviewing his *Atkins* claim on post-conviction, and the appellate court's uncertainty regarding the appropriate standard of review, infected the entire process and fails to comport with "the high regard for truth that befits a decision affecting the life or death of a human being" under *Ford*. (ECF 12 at 15). The Court disagrees. While the trial court may have misunderstood the appropriate standard when it first dismissed Williams' *Atkins* petition, the state appellate court clarified this issue in its February 2006 Opinion and remanded the matter for further consideration using the appropriate standard. *See State v. Williams*, Case No. 2004-T-0136 (11th Dist. Ct. App. Feb. 13, 2006) (Suppl. Appx. Disc 2 at 2681).  On remand, the trial court expressly noted the appellate court's instructions regarding its options for addressing Williams' petition and the appropriate standards to be used. *See State v. Williams*, Case No. 88-CR-365 (Trumbull Cty Ct. Cmn. Pl. Sept. 11, 2007).  As set forth *supra*, the trial court employed these standards and again dismissed Williams' petition without a hearing. In its subsequent decision affirming the trial court, the

appellate court does not find that the trial court again misapplied the appropriate standard under Ohio law.

In light of the above, the Court finds that any confusion regarding the appropriate standards for reviewing Williams' *Atkins* petition was corrected on remand. Moreover, Williams has not demonstrated that the appellate court judges' disagreement over the appropriate appellate standard of review violated his due process rights under clearly established federal law. Although there was a dispute regarding whether to apply a *de novo* or abuse of discretion standard, the fact remains that two of the three Judges on the panel found that the trial court properly dismissed Williams' petition without a hearing. Williams' argument that his due process rights were violated as a result of this issue is without merit.

### c.    Failure to Appoint Two Attorneys

The Court also rejects Williams' argument that the state courts violated due process by failing to appoint two attorneys to represent him in his *Atkins* proceedings. Once again, Williams cites no authority for the proposition that the state courts' failure to appoint two attorneys violates clearly established federal law. He does point out that several state appellate courts have determined that an indigent capital defendant raising an *Atkins* claim for the first time in a post-conviction proceeding is entitled to be represented by two certified attorneys. *See State v. Burke*, 2005 WL 3557641 at * 12 (Ohio App. 10th Dist. Dec. 30, 2005); *State v. Lorraine*, 2005 WL 1208119 at * 6 (Ohio App. 11th Dist. May 20, 2005). These cases, however, do not constitute "clearly established federal law" for purposes of § 2254(d)(1). Williams' argument that his federal due process rights were violated because he was not appointed two certified attorneys is without merit.

### d.    Failure to Inquire Into Dr. Eisenberg's Qualifications

-61-

Williams next argues his due process rights were violated because the trial court failed to inquire "whether Dr. Eisenberg was even qualified to assess mental retardation and/or conduct the necessary testing in order to provide a competent evaluation in accordance with minimum professional standards."[33] (ECF 12 at 19-20).  He maintains nothing in the state court record establishes that Dr. Eisenberg was a "properly qualified expert" on the issue of mental retardation. He notes  Dr. Eisenberg did not submit a resume establishing his qualifications and the trial court failed to inquire whether Dr. Eisenberg was competent to render an *Atkins* determination. Williams now argues that Dr. Eisenberg was not, in fact, a qualified and competent expert on the issue of mental retardation.  This is evidenced, he maintains, by the fact that Dr. Eisenberg's report failed to either (1) take into account either the SEM or the Flynn Effect; (2) address Williams' previous elementary school IQ scores; or (3) render an analysis or opinion regarding adaptive skill deficits. (ECF 12 at 19-26).

Relying on *Ford* and *Panetti*, Williams argues that "the competency of the expert is properly considered as a component part of assessing the constitutional adequacy under due process of the state procedures." (ECF 12 at 21).  Because the deficiencies in Dr. Eisenberg's report indicate he was not competent to render an opinion regarding Williams' mental retardation, Williams argues the trial court violated his due process rights by failing to conduct an inquiry into Eisenberg's qualifications.

The Court rejects this argument.  It is undisputed that Williams himself expressly requested authorization and funds from the Court to hire Dr. Eisenberg as an expert to investigate his *Atkins*

---

[33]    Williams argues the trial court should have conducted this inquiry according to the standards set forth in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993) and *Kumho Tire v. Carmichael*, 526 U.S. 137 (1999).

claim. (Suppl. Appx. Disc 1 at 704- 707). While Williams' argument might have force were it directed toward an expert witness with disputed qualifications who was selected by the Court or the State, the Court sees no reasonable basis to impose on the state trial court an independent obligation under federal due process principles to question whether Williams' chosen *Atkins* expert is competent and qualified. Essentially, Williams is asking this Court to find that the state courts had an obligation under federal law to protect him from his own choice of expert. Williams cites no federal authority for this proposition. The Court declines to find that, as a matter of clearly established federal law, the state courts violated Williams' due process rights by failing to *sua sponte* launch an inquiry into Williams' own expert's qualifications. This argument is without merit.

### e. Failure of Trial Court to Consider SEM and Flynn Effect

Williams argues the state courts violated his due process rights by failing to take into account the standard error of measurement ("SEM") and "Flynn Effect" in evaluating Dr. Eisenberg's report. According to Williams, the SEM refers to a measurement error of approximately five points in assessing IQ.[34] Adjusting for the SEM, Williams argues his IQ score of 75 (as measured by Dr. Eisenberg) actually places his IQ between 70 and 75. With respect to the "Flynn effect," Williams argues this principle describes the phenomenon in which IQ scores tend to rise over time, requiring scores to be adjusted downward as tests are renormed. Williams states that, generally, individuals gain about .33 point per year on IQ tests. Because Dr. Eisenberg measured

---

[34]    Williams cites the American Psychiatric Association ("APA"), Diagnostic and Statistical Manual of Mental Disorders, Fourth Ed., Text Revision 41-42 (2000) (hereinafter "DSM-IV-TR"), which notes that "there is a measurement error of approximately 5 points in assessing IQ."

Williams' IQ six years after the WAIS-III norms were developed, Williams argues that, per the Flynn effect, his IQ score of 75 was inflated by approximately 2 points. (ECF 6 at 24).

Williams maintains *Atkins* requires state courts to take the SEM and Flynn Effect into consideration and assess IQ scores within a range rather than as a single number. (ECF 12 at 26). When considering these factors, he maintains that his IQ score of 75 (as reported in Dr. Eisenberg's Preliminary Report) "falls within the range of mental retardation." He further argues the state courts' failure to consider the SEM and Flynn Effect "diminishes the accuracy and reliability [of] the fact-finding process that is constitutionally mandated." (ECF 12 at 26).[35]

In *Atkins*, the Supreme Court acknowledged that "[n]ot all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus." *Atkins*, 536 U.S. at 317. Accordingly, the Court left to the States the "task of developing appropriate ways to enforce the constitutional restriction" and declined to impose a specific clinical definition of mental retardation. *Id.* The Court did, however, reference the clinical definitions of mental retardation adopted by the American Association of Mental Retardation ("AAMR") and American Psychiatric Association ("APA") and noted that "[i]t is estimated that between 1 and 3 percent of the population has an IQ between 70 and 75 or lower, which is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition." *Id.* at 309, fn. 5.

The *Atkins* decision does not, however, mandate that state courts take the SEM and Flynn

---

[35] The Court considers this issue in connection with Williams' claim under § 2254(d)(1) in light of the Sixth Circuit's recent holding that "[t]he rules governing what factors may be considered in determining whether a defendant qualifies as mentally retarded under *Atkins* deal with questions of law." *Black v. Bell*, 664 F.3d 81, 100 (6th Cir. 2011).

Effect into account. Several Circuit Courts to consider the issue have, therefore, determined that a state courts' failure to account for and apply the SEM or Flynn Effect is not "contrary to clearly established federal law" for purposes of § 2254(d)(1). *See e.g. Hooks v. Workman*, ---- F.3d -----, 2012 WL 3140916 at * 11 (10th Cir. Aug. 3, 2012) (finding that "*Atkins* does not mandate an adjustment for the Flynn Effect" and, therefore, the state courts' failure to account for and apply the Flynn Effect was not contrary to or an unreasonable application of clearly established federal law); *Harris v. Thaler*, 2012 WL 795698 at ** 5 (5th Cir. March 12, 2012) (finding that "[n]o clearly established federal law requires that a state or federal court only accept IQ scores adjusted by the Flynn Effect or Standard Error of Measurement"); *Green v. Johnson*, 515 F.3d 290, 300, n 2 (4th Cir. 2008) (applying Virginia law in reviewing habeas petition and observing that "neither *Atkins* nor Virginia law appear to require expressly that [the Flynn Effect or the Standard Error of Measurement] be accounted for in determining mental retardation status").

Ohio law does not mandate consideration of SEM or Flynn effect evidence either. While the Ohio Supreme Court's decision in *Lott* states that the "clinical definitions of mental retardation cited with approval in *Atkins* provide a standard for evaluating an individual's claim of mental retardation," it does not expressly require that the SEM or Flynn Effect be taken into account in every *Atkins* determination. *Lott*, 97 Ohio St.3d at 305. Williams notes that Ohio's 10th District Court of Appeals has held that state trial courts must consider SEM and Flynn Effect evidence in considering *Atkins* claims. *See State v. Burke*, 2005 WL 3557641 (Ohio App. 10th Dist. Dec. 30, 2005); *State v. Waddy*, 2011 WL 2536366 (Ohio App. 10th Dist. June 28, 2011). Based on these decisions, he argues the state courts in his case were required to adjust his IQ score of 75 downward to account for both the SEM and Flynn Effect.

-65-

The Court disagrees. As an initial matter, the state appellate decisions cited by Williams do not constitute clearly established law for purposes of this Court's habeas review. More importantly, the Court notes that Williams did not submit any expert evidence regarding the SEM or the Flynn Effect to the state courts. Dr. Eisenberg did not discuss either the SEM or the Flynn Effect in his Preliminary Report and no other expert evidence was presented to the state courts regarding this issue. This is not a situation where a prisoner introduced SEM and/or Flynn Effect evidence and the state courts unreasonably failed to consider it. To the contrary, in this case, there simply wasn't any expert evidence presented regarding the SEM or Flynn Effect.[36] In the absence of such evidence, it was not contrary to clearly established federal law for the state courts to fail to take into account the SEM or Flynn Effect when considering Williams' IQ score as presented in Dr. Eisenberg's report.

This is particularly so given that courts have held that "there is no scientific consensus" on the validity of the Flynn Effect. *See e.g. Hooks*, 2012 WL 3140916 at * 11 (10th Cir. Aug. 3, 2012); *Maldonado v. Thaler*, 625 F.3d 229, 238 (5th Cir. 2010) (stating that "neither this Court nor [the

---

[36]    For these reasons, the instant case is distinguishable from the Sixth Circuit's recent decision in *Black v. Bell*, 664 F.3d 81 (6th Cir. 2011). In that case, Black presented expert evidence that his IQ scores should be adjusted downward based on the SEM and Flynn Effect. The state courts refused to consider this evidence based on their interpretation of Tennessee Supreme Court precedent. On habeas review, the district court found the state courts' determination was not unreasonable. The Tennessee Supreme Court subsequently clarified its interpretation of *Atkins* in *Coleman v. State*, 341 S.W.3d 221 (Tenn. 2011), and explained therein that Tennessee courts may receive and consider relevant and admissible evidence regarding the SEM and Flynn Effect. The Sixth Circuit determined that the Tennessee state courts' refusal to consider the SEM and Flynn Effect expert evidence was contrary to *Coleman* and remanded the case to the district court for reassessment of Black's *Atkins* claim based on the *Coleman* decision. The instant case is distinguishable from *Black* because Williams did not present any expert evidence regarding the SEM and/or Flynn Effect for the state courts to consider.

-66-

Texas Court of Criminal Appeals] has recognized the Flynn Effect as scientifically valid"); *State v. Waddy*, 2011 WL 2536366 at * 4 (Ohio App. 10th Dist. June 28, 2011) (recognizing that "[c]ourts throughout the country have reached differing views with respect to application of the Flynn Effect. Some courts have questioned its validity.. . . Other courts, however, have given recognition to the theory"). Moreover, with regard to the SEM, courts have recognized that application of the SEM could result in adjustment of an IQ score either upward or downward. In the absence of expert evidence regarding this issue, the state courts would have had to speculate that application of the SEM to Williams' IQ score would have lowered, rather than, raised it. *See Hedrick v. True*, 443 F.3d 342, 368 (4th Cir. 2006) (finding that "only speculation on our part would lower Hedrick's IQ score of 76. As Hedrick concedes, the SEM could potentially increase his IQ score to 81"); *Walton v. Johnson*, 440 F.3d 160, 178 (4th Cir. 2006) ("Walton can only speculate that this [SEM] (which a mental health expert can take into account to either raise or lower a given IQ test score by as much as five points) actually lowered his given score of 77 enough to meet Virginia's mental retardation standard").

Under these circumstances, the Court finds the state courts' failure to adjust Williams' IQ score of 75 to take into account either the SEM or the Flynn Effect was not contrary to, or an unreasonable application of, clearly established federal law for purposes of § 2254(d)(1).

### f.    Ineffective Assistance of *Atkins* Post-Conviction Counsel

Williams next argues that the failure of his appointed counsel to competently litigate his *Atkins* claim in state court "violated due process by denying [him] meaningful access to court." (ECF 12 at 26-33). He maintains the "fair hearing" requirement of *Ford* "necessarily requires a counsel competent to both investigate and prosecute [a petitioner's] *Atkins* claim." (ECF 12 at 27).

-67-

Williams then claims that his *Atkins* post-conviction counsel was ineffective because he (1) requested the Court appoint Dr. Eisenberg without any indication that Dr. Eisenberg was qualified in the "sub-field" of mental retardation; (2) failed to provide Dr. Eisenberg with Williams' early school records, psychological evaluations, and informative prison records; (3) failed to ensure that Dr. Eisenberg considered the SEM and Flynn Effect in evaluating Williams' IQ score; (4) failed to note that Williams' prison records contained numerous documents supporting adaptive skills deficits; and (5) failed to bring to the Court's attention that there were prison records supporting the claim that Williams required assistance working on his legal matters. (ECF 12 at 30-31). Based on the above, Williams claims that "the incompetence of appointed *Atkins* counsel undermined the reliability of the *Atkins* fact-finding process." (ECF 12 at 32).

It is well-established that the ineffectiveness of counsel during federal or state post-conviction proceedings "shall not be a ground for relief in a proceeding arising under [28 U.S.C.] section 2254." *See* 28 U.S.C. § 2254(i). Accordingly, this Court cannot consider, as a separate and independent ground for relief, whether Williams' *Atkins* post-conviction counsel provided ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984).

Williams attempts to circumvent this restriction, however, by claiming that his *Atkins* counsel's alleged ineffectiveness violated his due process rights by denying him meaningful access to the courts. In a recent decision, the Tenth Circuit considered this issue "as a matter of first impression in the federal courts" and found that the right to effective assistance of counsel extended to the *Atkins* post-conviction proceeding at issue in that case. *Hooks v. Workman*, 2012 WL 3140916 at ** 24 (10th Cir. Aug. 3, 2012). The court further concluded that "the right to counsel in *Atkins* proceedings is 'clearly established Federal law, as determined by the Supreme Court of the

-68-

United States.'" *Id.* at * 26. In so holding, however, the court explicitly acknowledged that "the Supreme Court has never said that defendants have a right to counsel in *Atkins* proceedings, nor has it ever identified such a proceeding as one of the 'critical stages' to which the right attaches." *Id.* at *25.

Absent clear guidance from the Supreme Court, this Court is unwilling to find that the right to effective assistance of counsel in *Atkins* post-conviction proceedings constitutes "clearly established federal law" for purposes of § 2254(d)(1). Williams' argument to the contrary is without merit.[37]

### g. Conclusion

For all the reasons set forth above, the Court finds the procedures used by the Ohio courts to adjudicate Williams' *Atkins* claim did not violate his due process rights contrary to clearly established federal law pursuant to § 2254(d)(1). Accordingly, this argument in support of Williams' First Ground for Relief is without merit and denied.

### 2. § 2254(d)(2): State Court Factual Determinations

In the second primary argument supporting his First Ground for Relief, Williams argues the state courts' failure to conduct an evidentiary hearing regarding his *Atkins* claim constituted an

---

[37] In his Traverse, Williams argues that "it violates Mr. Williams' right to Equal Protection to promise a mentally retarded defendant facing capital charges constitutional effective counsel in asserting his right under *Atkins*, yet deny that same safeguard to Mr. Williams, a convicted inmate whose first opportunity to present his claim of mental retardation arose in post-conviction proceedings." (ECF 12 at 33). Although presented as an argument in support of his due process claim under § 2254(d)(1), the Court finds Williams' equal protection argument is a separate and independent claim that was not raised as such in his Petition. Accordingly, this Court will not consider this claim. *See Murphy v. Ohio,* 551 F.3d 485, 505 fn 4 (6th Cir. 2009)(stating that "a district court may decline to review a claim that a party raises for the first time in his traverse")(citing *Tyler v. Mitchell,* 416 F.3d 500, 504 (6th Cir. 2005)).

unreasonable determination of the facts in light of the evidence presented pursuant to § 2254(d)(2).

He also maintains the state courts' factual determinations regarding *Atkins'* three clinical criteria

were unreasonably determined based upon the evidence in the state court record. (ECF 12 at 1).

Specifically, Williams argues the state appellate court's decision is unreasonable because it "ignored

material evidence" supporting his claim, including (1) evidence of Williams' "chronic" deficits as

alleged in Ms. Vail's Affidavit; and (2) prison records indicating deficits in the areas of functional

academic skills, communication skills, community use, and self-direction. (ECF 6 at 47-52).

Williams maintains that, had this evidence been properly considered by the state courts, it would

have created a genuine issue of material fact, thus necessitating an evidentiary hearing.

Williams also argues the state appellate court made several legal errors in assessing his

mental retardation claim which "infected the fact-finding of the court." (ECF 6 at 52). In particular,

Williams asserts the state appellate court made an error of law in determining that Williams' IQ

score of 75 (as measured by Dr. Eisenberg) did not fall within the range of mental retardation when

adjusted for the SEM and Flynn Effect. He further argues the state court erroneously considered

the trial record of the underlying crimes in assessing Williams' adaptive skill deficits by improperly

"conflat[ing] facts that support criminal responsibility standards with the Eighth Amendment

prohibition against executing the mentally retarded, thereby violating the clear tenets of *Atkins*."

(ECF 12 at 43). In light of the above, Williams' maintains the state courts unreasonably

determined, based on the evidence presented, that Williams failed to present sufficient operative

facts to either warrant an evidentiary hearing or withstand summary judgment.

Because this Court has found the state courts' fact-finding procedures in assessing Williams'

*Atkins* claim were not contrary to clearly established federal law pursuant to § 2254(d)(1), this Court

applies AEDPA deference in its analysis of the state courts' factual determination that Williams

presented insufficient evidence of mental retardation to withstand summary judgment. In order to

demonstrate that a state court's decision was based on an unreasonable determination of the facts

under § 2254(d)(2), a petitioner must both establish the "unreasonable determination" and show

"that the resulting state court decision was 'based on' that unreasonable determination." *Titlow v.*

*Burt*, 680 F.3d 577, 585 (6th Cir. 2012) (quoting *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011)).

As the Supreme Court has observed, "[t]he term 'unreasonable' is no doubt difficult to define."

*Williams v. Taylor*, 529 U.S. 362, 410 (2000). "It suffices to say, however, that a state-court factual

determination is not unreasonable merely because the federal habeas court would have reached a

different conclusion." *Wood v. Allen*, 558 U.S. 290, 130 S.Ct. 841, 849 (2010). Even if reasonable

minds reviewing the record might disagree about the state-court factual finding in question, "on

habeas review that does not suffice to supersede" the state court's factual determination. *Rice v.*

*Collins*, 546 U.S. 333, 341-42 (2006).[38]

    In its June 30, 2008 Opinion affirming the trial court's dismissal of Williams' *Atkins*

petition, the state appellate court first found that Williams had met his burden with respect to the

third criteria established in *Lott*; i.e. "onset before the age of 18." *State v. Williams*, 2008 WL

---

[38]    It is an open question whether § 2254(e)(1), which presumes the correctness of state court factual findings absent clear and convincing evidence to the contrary, "applies in every case presenting a challenge under § 2254(d)(2)." *Wood*, 130 S.Ct. at 845 (leaving "for another day" a decision on the relationship between § 2254(d)(2) and (e)(1)). *See also Rice*, 660 F.3d at 254, fn 6. In the instant case, Williams argues Respondent waived the arguably more deferential "presumption of correctness" standard in § 2254(e)(1) by failing to raise it in her Return. (ECF 12 at 46). The Court need not decide this issue, however, or the issue of the relationship between § 2254(d)(2) and (e)(1). Even applying the "unreasonableness" standard of § 2254(d)(2) and not the "presumption of correctness" standard in (e)(1) as argued by Williams, the Court finds that the state courts' factual determinations were not unreasonable in light of the evidence presented for the reasons set forth *infra*.

2582849 at * 5. However, it went on to find that:

> With respect to the first two criteria, however, Williams failed to introduce any evidence of present disability. As recently emphasized by the Ohio Supreme Court, the definition of retardation adopted by *Lott* contemplates "substantial limitations in **present functioning**." *White*, 2008-Ohio-1623 at ¶ 6, citing *Atkins*, 536 U.S. at 308 (emphasis added). Likewise, this court has stated that, although the manifestation of mental retardation must occur before the age of 18, "the determination of whether a defendant is mentally retarded under *Atkins* standards must be made in the present." *State v. Lorraine*, 11th Dist. No. 2006-T-0100, 2007-Ohio-6724, at ¶ 21.

> The only recent psychological evaluation of Williams, conducted by a psychologist of his choosing, concluded "with reasonable psychological certainty" that Williams "does not currently meet the criteria for a diagnosis of mental retardation based on the *Lott* definition." Using the WAIS-III test, Dr. Eisenberg determined Williams to have a full scale IQ of 75, at which score he is rebuttably presumed not to be mentally retarded. *Lott*, 2002-Ohio-6625, at ¶ 12. Although Dr. Eisenberg acknowledges that Williams "is significantly impaired in all areas of intellectual functioning * * * , his testing does not place him in the mentally retarded range of intelligence."

> It cannot be reasonably inferred from this evidence that Williams has significantly subaverage intellectual functioning and significant limitations in two or more adaptive skills. Williams' school records and evaluations, and the affidavit of his cousin Vail, only attest his intellectual capacity and functioning prior to 1989. They do not constitute competent evidence from which inferences may be made regarding his present mental capacity. [citation omitted].

> With respect to limitations in adaptive skills, Williams presented no evidence of current significant limitations. The State, on the other hand, presented considerable evidence of Williams' ability to function competently, managing his legal affairs, procuring medicine and other necessities, and maintaining personal correspondence. The trial court also noted the trial record of the underlying crimes demonstrates Williams' ability to function and act for his own self-preservation.

> The first assignment of error is without merit.

*State v. Williams*, 2008 WL 2582849 at * 6.

Because the state appellate court determined that Williams satisfied the "age of onset"

criteria, this Court need not review that court's factual determinations regarding that issue. Instead, the Court limits its review to the state court's factual determinations regarding the "significant subaverage intellectual functioning" and "adaptive skills deficits" criteria for mental retardation as set forth in *Lott*. For the following reasons, the Court finds the state appellate court's factual determinations that Williams failed to demonstrate either of these criteria are not unreasonable in light of the evidence presented pursuant to § 2254(d)(2).

a.    <strong>Significant Subaverage Intellectual Functioning</strong>

As set forth above, the Ohio Supreme Court held in *Lott* that a defendant must demonstrate "significantly subaverage intellectual functioning" in order to be considered mentally retarded for *Atkins* purposes. *Lott*, 97 Ohio St.3d at 305. The *Lott* decision further explained that "there is a rebuttable presumption that a defendant is not mentally retarded if his or her IQ is above 70." *Id.* In *White*, the Ohio Supreme Court noted that "[i]n *Atkins*, 536 U.S. at 308, fn 3, the United States Supreme Court quoted the definitions of mental retardation promulgated by the [AAMR] and the [APA]" and further explained that "[t]he AAMR defines mental retardation as 'substantial limitations in **present** functioning.'" *White*, 118 Ohio St.3d at 13 (emphasis added).

Williams offered the following evidence in support of his claim that he possessed "significantly subaverage intellectual functioning." He cited Frank Goodman's mitigation testimony that Williams was placed in a developmentally handicapped program in the fourth grade because he met the program requirements of an IQ of 80 or below and deficiencies in two areas of "adaptive behavior" such as communication skills, living skills, etc. (Apx. Vol. XXXIX at 19). He also introduced the results of psychological evaluations conducted in 1973, 1978 and 1983, during which he was evaluated by school psychologists and his IQ was tested. These evaluations indicated that

-73-

Williams scored (1) an IQ of 76 in 1973 when he was six years old; (2) an IQ of 78 in 1978 when he was approximately eleven years old; and (3) an IQ of 67 in 1983 when he was almost sixteen years old.  (Appx. Vol. XXXIX at 15-16, 126).

Williams also cited the affidavit of his cousin, Stacey Vail. (Suppl. Appx. Disc 1 at 435). Ms. Vail stated that she had known Williams "from his early pre-school years until the date of his . . . conviction" in 1989 and had interacted with him consistently throughout this period and "observed him in social, educational, and familial environments." (Suppl. Appx. Disc 1 at 435). Based on these observations, she stated that Williams (1) neither possessed nor developed the ability to distinguish any nuance in language or behavior in others; (2) would oftentimes be unable to respond to basic inquiries from others and would "stammer incomprehensible babble" on these occasions; and (3) would always accept every statement from another in a literal sense and could not perceive or understand the motivation of others. (Suppl. Appx. Disc 1 at 435).  She also averred that it was "common knowledge" that Williams was "severely challenged in a mental capacity and could not learn to cope on a day to day basis on any level." (Suppl. Appx. Disc 1 at 435).

Finally, Williams submitted the Preliminary Report of Dr. Eisenberg.  As set forth *supra*, Dr. Eisenberg conducted a clinical interview of Williams in November 2003 and administered the WAIS-III in order to measure his IQ. (Suppl. Appx. Disc 1 at 728). Dr. Eisenberg determined that Williams scored a Full Scale IQ of 75, which placed him in the "borderline range of intelligence." (Suppl. Appx. Disc 1 at 729).  He further concluded that Williams produced a "valid, reliable, and consistent index of his current intellectual functioning" and that, although he is significantly impaired in his intellectual functioning, "his testing does not place him in the mentally retarded range of intelligence." (Suppl. Appx. Disc 1 at 729).  Dr. Eisenberg further noted that Williams

-74-

"demonstrated no impairment in reasoning" and that "[h]is verbal communication skills were coherent and logical." (Suppl. Appx. Disc 1 at 730). Based on the above, Dr. Eisenberg concluded that "[i]t is my preliminary opinion, with reasonable psychological certainty, that Mr. Williams does not currently meet the criteria for a diagnosis of mental retardation based on the *Lott* definition." (Suppl. Appx. Disc 1 at 730).

In his briefing before the trial court, Williams conceded that his *Atkins* claim "does not on its face appear to be a strong one" in light of Dr. Eisenberg's report. (Suppl. Appx. Disc 1 at 717). However, he argued that Ms. Vail's Affidavit and his previous IQ score of 67 constituted "objective manifestations" indicating mental retardation, thus entitling him to an evidentiary hearing.

As set forth *supra*, the state appellate court found that Williams was rebuttably presumed not to be mentally retarded in light of Dr. Eisenberg's determination that Williams had a Full Scale IQ of 75. The court further found that Williams' school records and evaluations, and the affidavit of Ms. Vail, "only attest his intellectual capacity and functioning prior to 1989" and "do not constitute competent evidence from which inferences may be made regarding his present mental capacity." *State v. Williams*, 2008 WL 2582849 at * 6. Accordingly, the court found Williams had failed to raise a genuine issue of material fact with respect to the first *Atkins* criteria of "significant subaverage intellectual functioning."

The Court finds that the state appellate court's determination that Williams failed to demonstrate present "significant subaverage intellectual functioning" is not unreasonable in light of the evidence presented. Williams' own expert determined he had a Full Scale IQ of 75 and was not mentally retarded under the standards set forth in *Atkins* and *Lott*. Williams presented no other

-75-

expert evidence regarding his current intellectual functioning to rebut the presumption set forth in *Lott* that he was not mentally retarded. He maintains, however, that the state court unreasonably failed to consider Ms. Vail's Affidavit as anecdotal evidence of "chronic" subaverage intellectual functioning. The Court disagrees. Ms. Vail does not aver that Williams was ever diagnosed as mentally retarded or that she herself is capable of rendering such a diagnosis. In light of Dr. Eisenberg's report and conclusions, the Court finds the state court was not unreasonable in determining that Ms. Vail's general averment that Williams was "severely challenged in a mental capacity" was insufficient to create a genuine issue of material fact on this issue. In light of the absence of such evidence, the state appellate court was not unreasonable in determining that Williams failed to create a genuine issue of material fact sufficient to either entitle him to an evidentiary hearing or withstand summary judgment.

Williams argues the state court's factual determination on this issue was unreasonable because his IQ of 75 "falls within the range of mental retardation." First, he maintains the state court unreasonably failed to adjust this IQ score downward to account for the SEM and Flynn Effect. The Court rejects this argument for the reasons set forth in Section V.A.1.e of this Opinion. Second, Williams argues the state court unreasonably failed to determine that an IQ score of 75 constituted *prima facie* evidence of mental retardation, even without adjustments for SEM and/or the Flynn Effect. In support of this argument, Williams notes that *Atkins* itself states, in a footnote, that "[i]t is estimated that between 1 and 3 percent of the population has an IQ between 70 and 75 or lower, which is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition." *Atkins*, 536 U.S. at 309, fn 5.

The Court rejects this argument. Although *Atkins* states in dicta that an IQ between 70 and

-76-

75 is "typically" considered the cutoff IQ score for purposes of significant subaverage intellectual functioning, it expressly acknowledged that "[t]o the extent there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded." *Id.* at 317. For this reason, the Supreme Court left to the States "the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." *Id.* The Ohio Supreme Court determined in *Lott* that "there is a rebuttable presumption that a defendant is not mentally retarded if his or her IQ is above 70." *Lott,* 97 Ohio St.3d at 305. Under the circumstances presented in the instant case, the state appellate court was not unreasonable in determining that Williams had failed to present evidence sufficient to rebut the presumption that he was not mentally retarded in light of his IQ score of 75. Williams' argument that the state court unreasonably determined he failed to satisfy the "significant subaverage intellectual functioning" criteria is without merit.

### b.    Adaptive Skills Deficits

In order to demonstrate mental retardation under *Lott,* Williams must also demonstrate that he has "significant limitations in two or more adaptive skills." *Lott,* 97 Ohio St.3d at 305. As the Ohio Supreme Court recently explained, "[a]daptive skills are those skills that one applies to the everyday demands of independent living, such as taking care of oneself and interacting with others." *White,* 118 Ohio St.3d at 15. The clinical definitions of mental retardation cited with approval in *Atkins* provide the following examples of adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. *Atkins,* 536 U.S. at 308, fn. 3 (citing AAMR and APA clinical definitions of mental retardation).

-77-

Williams offered the following evidence in support of his claim of significant limitations in two or more adaptive skill areas. He cited Ms. Vail's Affidavit as evidence of chronic deficits in the areas of communication, social/interpersonal skills, and self-direction, emphasizing her statements that Williams (1) would "stammer incomprehensible babble" when faced with "basic inquiries;" (2) "neither possessed nor developed the ability to distinguish any nuance in language or behavior in others;" and (3) "would always accept every statement from another in a literal sense and could not perceive or understand the motivation of others." (Suppl. Appx. Dix 1 at 435).

He also relied upon his elementary and high school records. In Williams' initial referral evaluation in 1973 (when he was six years old), the psychologist noted that Williams had experienced difficulty in the diagnostic reading program; had symptoms which reminded his teachers of "youngsters with learning disabilities;" and was "distractible, immature and disorganized." (ECF 6-7 at 1). This evaluation also noted that Williams had "poor listening skills" and his "fine motor development is so immature that he scored at a pre-school level on the subtest." (ECF 6-7 at 2). During Williams' next evaluation in 1978 (when he was eleven years old), the psychologist found he was functioning at a second grade level in reading and spelling and at a third grade level in arithmetic. (ECF 6-8 at 1). The evaluation further noted that Williams was sometimes "immature and impulsive" and that he had earned a mental age of 8 years, 9 months on the Stanford-Binet Intelligence Scale. (ECF 6-8 at 1). During Williams' final evaluation in 1978 (when he was almost sixteen years old), the psychologist noted that Williams was "a disruptive influence in the class and does not socialize appropriately with his classmates." (ECF 6-9 at 1). That evaluation also noted that Williams had a "social age" of 9 years old and exhibited deficiencies in communication, occupation, locomotion, and self-direction. (ECF 6-9 at 2).

-78-

In addition, Williams directs the Court's attention to a number of "kites" written by him during his incarceration. *See e.g.* ECF 6-12, 6-13; Suppl. Appx. Disc 2 at 2432, 2440-42, 2455, 2459, 2468, 2473-74, 2477-79. These kites were included in Williams' prison file and admitted into the state court record. Williams asserts these kites constitute additional evidence of current deficits in communication and functional academic skills, arguing that they are written in "a scrawled handwriting akin to that of a child, often with spelling and grammatical mistakes" and are "consistent with an individual that is educable mentally retarded." (ECF 6 at 51). Williams maintains these documents "were of critical significance" to his *Atkins* litigation but the state appellate court failed to address or consider them as evidence of adaptive skills deficits.

In its Motion for Dismissal and/or Summary Judgment, the State argued Williams had failed to satisfy his burden of presenting sufficient evidence to create a genuine issue of material fact that he possessed significant limitations in two or more adaptive skill areas. The State also introduced its own evidence indicating that Williams did not, in fact, satisfy this criteria. Specifically, the State emphasized several psychological evaluations conducted by prison psychiatrists over the course of Williams' incarceration including (1) a July 2003 Memo from Dr. Kenneth Covey which found that Williams' functioning was at a level "far above that of mental retardation;" and (2) several mental health assessments conducted by MCI psychiatrists in 2001 and 2002, none of which classify Williams as mentally retarded. (Suppl. Appx. Disc 1 at 516, 533-36). In addition, the State noted that Williams had filed several *pro se* motions in the Sixth Circuit Court of Appeals to have his counsel removed and, further, had filed a *pro se* negligence action against MCI in the Ohio Court of Claims. The State also argued that Williams' voluminous prison correspondence demonstrated a "well-developed ability to communicate effectively through handwritten and type-written

-79-

correspondence to promote his own interests and objectives." (Suppl. Appx. Disc. 1 at 4942-93). Finally, the State emphasized testimony from a January 24, 1989 suppression hearing indicating that, despite over four hours of police interrogation, Williams did not confess to any crimes and, in fact, refused to sign a waiver of rights form. (Suppl. Appx. Disc 1 at 502-03).

In response, Williams argued the *pro se* legal filings and correspondence attributed to him by the State were unauthenticated and "[i]t is far more likely . . . that Petitioner relied on other inmates" to draft these documents. (Suppl. Appx. Disc. 1 at 717, 721, 725). Although Williams attached Dr. Eisenberg's report to his brief in opposition to the State's Motion to Dismiss, Dr. Eisenberg did not address the issue of adaptive skill deficits. Thus, Williams did not present any expert testimony to the state courts regarding this issue.

Applying a *de novo* standard of review, the state appellate court determined that "[i]t cannot be reasonably inferred from this evidence that Williams has . . . . significant limitations in two or more adaptive skills." *State v. Williams*, 2008 WL 2582849 at * 6 (Ohio App. 11th Dist. June 27, 2008). Emphasizing the definition of mental retardation in *Lott* contemplates "substantial limitations in **present** functioning," the state appellate court found that "Williams' school records and evaluations, and the affidavit of his cousin Vail, only attest his intellectual capacity and functioning prior to 1989" and "do not constitute competent evidence . . . regarding his present mental capacity." *Id.* (emphasis in original). Additionally, the court noted that:

> With respect to limitations in adaptive skills, Williams presented no evidence of current significant limitations. The State, on the other hand, presented considerable evidence of Williams' ability to function competently, managing his legal affairs, procuring medicine and other necessities, and maintaining personal correspondence. The trial court also noted the trial record of the underlying crimes demonstrates Williams' ability to function and act for his own self-preservation.

*Id.*

The Court finds the state appellate court's determination that Williams failed to satisfy his burden of demonstrating current "significant limitations in two or more adaptive skills" is not unreasonable in light of the evidence presented. As an initial matter, the Court notes that Williams failed to present any expert evidence to the state courts regarding this criteria. Dr. Eisenberg's report does not address the issue of adaptive skill deficits, and Williams did not present any other expert evidence regarding this issue to the state courts. This absence of expert evidence significantly weakens Williams' claim, as the question of whether an individual claiming mental retardation has adaptive skill deficits has been acknowledged to be a complicated one that depends on professional evaluation and judgment. *See e.g. Hill*, 662 F.3d at 1373 (11th Cir.)(dissent)(noting the AAMR "itself admits that adaptive skills impairment is an 'elusive' concept, depending on interviews, observation, and professional judgment for diagnosis") (citing AAMR, Mental Retardation: Definitions, Classifications, and Systems of Supports, 39-40, 89-90 (10th ed. 2002)).

The only evidence Williams presented to the state courts on this issue was his school records and Ms. Vail's affidavit, both of which speak to Williams' deficits prior to 1989. While Williams argues the state court should have construed Ms. Vail's affidavit as evidence of "chronic deficits," it was not unreasonable for the state appellate court to reject this argument. As this Court has already noted, Ms. Vail does not aver that Williams was ever diagnosed as mentally retarded or that she herself is capable of rendering such a diagnosis. Moreover, many of her statements relating to Williams' alleged adaptive skills deficits were belied by other evidence. For example, Ms. Vail's statement that Williams would "stammer incomprehensible babble" when asked a "basic inquiry" is not consistent with either Dr. Eisenberg's observations or Williams' school records. Although

Dr. Eisenberg did not assess adaptive skill deficits, he did observe that Williams' "verbal communication skills were coherent and logical." (Suppl. Appx. Disc 1 at 730). Further, while Williams' school records noted problems and delays in Williams' academic development, none of them indicated he was unable to communicate in a comprehensible manner. Indeed, one of the school psychologist who evaluated Williams characterized him as "one of the higher functioning adjusted curriculum students." (ECF 6-8 at 2). Moreover, Ms. Vail's characterization of Williams as unable to "distinguish any nuance in language or behavior of others" or to "perceive or understand the motivation of others" is also inconsistent with testimony at the January 24, 1989 suppression hearing that Williams answered police questions for over four hours but refused to either confess or sign a waiver of rights form. (Suppl. Appx. Disc 1 at 609- 682). In light of the above, and in the absence of any expert evidence indicating the presence of current adaptive skill deficits, the Court finds the state court was not unreasonable in determining that Ms. Vail's affidavit failed to create a genuine issue of material fact regarding this criteria.

Finally, the Court notes that the handwritten "kites" cited in the Petition and Traverse as evidence of Williams' adaptive skill deficits are all dated from 1989 - 1991. *See e.g.* ECF 6-12, 6-13; Suppl. Appx. Disc 2 at 2432, 2440-42, 2455, 2459, 2468, 2473-74, 2477-79. Thus, even if they are construed as potentially indicative of adaptive skill deficits, they would not have been relevant to the state court's determination of Williams' present limitations and functioning.

Based on the above, the Court finds the state court was not unreasonable in determining that Williams failed to come forward with sufficient evidence of current "significant limitations in two or more adaptive skills." Pursuant to *Lott,* Williams bore "the burden of establishing that he is mentally retarded by a preponderance of the evidence." *Lott,* 97 Ohio St.3d at 307. *See also State*

*v. Were*, 118 Ohio St.3d 448, 478 (2008) (finding that "[p]lacing the burden of proof on Were to establish that he is mentally retarded is constitutional"). As set forth above, the state court was not unreasonable in determining that Williams failed to present evidence (expert or otherwise) containing sufficient operative facts to demonstrate current significant limitations in adaptive skills. On this basis alone, the Court finds the state court's determination that Williams failed to satisfy this criteria was not unreasonable in light of the evidence presented. For this reason as well, the Court rejects Williams' argument that the state court's factual determination is unreasonable because it referenced (1) prison correspondence and *pro se* legal filings that were unauthenticated and allegedly ghostwritten, and (2) the trial record of the underlying crimes. Having found that Williams failed to satisfy his initial burden of demonstrating that he satisfied this criteria, the state court's passing reference to additional documentary evidence submitted by the State was not integral to its resolution of this factual issue.

Accordingly, the Court finds the state court's determination that Williams failed to satisfy the "significant limitations in two or more adaptive skills" criteria is not unreasonable in light of the evidence presented pursuant to § 2254(d)(2).

### c.   Conclusion

For all the reasons set forth above, the Court finds the state court's factual determinations regarding *Atkins'* clinical criteria and failure to conduct an evidentiary hearing are not unreasonable in light of the evidence presented pursuant to § 2254(d)(2). Accordingly, this argument in support of Williams' First Ground for Relief is without merit and denied.

**B.   Second Ground for Relief:   Because Mr. Williams is mentally retarded, he cannot be executed and is therefore actually innocent of the death penalty.**

-83-

In his Second Ground for Relief, Williams argues he is mentally retarded and, therefore, cannot be executed. Accordingly, he maintains he is actually innocent of the death penalty and to execute him would amount to a "miscarriage of justice and a violation of his right to Due Process of Law as guaranteed by the Fourteenth Amendment to the United States Constitution." (ECF 6 at 56-57).

Williams' Second Ground for Relief is predicated on the argument that he is, in fact, mentally retarded. However, as set forth in Section V.A of this Opinion, the Court has found that the state courts were not unreasonable in determining that Williams failed to satisfy the criteria for mental retardation set forth in *Atkins* and *Lott.* Accordingly, the Court further finds that Williams is not "actually innocent" of the death penalty on this basis.[39] Williams' Second Ground for Relief is without merit and denied.

## VI.    Certificate of Appealability Analysis

This Court must now determine whether to grant a Certificate of Appealability ("COA") for either of Williams' Grounds for Relief. The Sixth Circuit Court of Appeals has determined that neither a blanket grant nor a blanket denial of a COA is an appropriate means by which to conclude

---

[39]    To the extent Williams is asserting a "free-standing" actual innocence claim, that claim is denied. In *Herrera v. Collins,* 506 U.S. 390 (1993), the Supreme Court stated in dicta that "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional" regardless of whether any constitutional violation occurred during trial. *Id.* at 417. Even if Williams was asserting such a "free-standing" actual innocence claim, however, it is unclear whether such a claim is cognizable on habeas. The claim has never been applied and, although the circuit courts are divided on this issue, the Sixth Circuit repeatedly has held that such a claim is not a valid ground for habeas relief. *See e.g. Cress v. Palmer,* 484 F.3d 844, 854-55 (6th Cir. 2007). Moreover, the *Herrera* Court emphasized that "the threshold showing for such an assumed right would necessarily be extraordinarily high." *Herrera,* 506 U.S. at 417; *see also House v. Bell,* 547 U.S. 518, 520 (2006). Williams has not made such showing in the instant case.

-84-

a capital habeas case as it "undermine[s] the gate keeping function of certificates of appealability, which ideally should separate the constitutional claims that merit the close attention of counsel and this court from those claims that have little or no viability." *Porterfield v. Bell*, 258 F.3d 484, 487 (6th Cir. 2001). Thus, in concluding this Opinion, this Court now must consider whether to grant a COA as to either Williams' First or Second Grounds for Relief pursuant to 28 U.S.C. § 2253.

That statute states in relevant part:

(C)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from --

(A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court . . .

(2) A certificate of appealability may issue under paragraph (12) only if the applicant has make a substantial showing of the denial of a constitutional right.

28 U.S.C. § 2253. This language is identical to the requirements set forth in the pre-AEDPA statutes, requiring a habeas petitioner to obtain a Certificate of Probable Cause. The sole difference between the pre- and post-AEDPA statutes is that the petitioner must now demonstrate he was denied a *constitutional* right, rather than the federal right that was required prior to the AEDPA's enactment.

The Supreme Court interpreted the significance of the revision between the pre- and post-AEDPA versions of that statute in *Slack v. McDaniel*, 529 U.S. 473 (2000). In that case, the Court held that Section 2253 was a codification of the standard it set forth in *Barefoot v. Estelle*, 463 U.S. 880 (1983), but for the substitution of the word "constitutional" for "federal" in the statute. *Id*. at 483. Thus, the Court determined,

[t]o obtain a COA under § 2253(c), a habeas prisoner must make a substantial showing of the denial of a constitutional right, a demonstration

-85-

> that, under *Barefoot*, includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were "adequate to deserve encouragement to proceed further."

*Id.* at 483-04 (quoting *Barefoot*, 463 U.S. at 893 n.4).

The Court went on the distinguish the analysis a habeas court must perform depending upon its finding concerning the defaulted status of the claim. If the claim is not procedurally defaulted, then a habeas court need only determine whether reasonable jurists would find the district court's decision "debatable or wrong." *Id.* at 484. A more complicated analysis is required, however, when assessing whether to grant a COA for a claim the district court has determined is procedurally defaulted. In those instances, the Court opined, a COA should only issue if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.* (emphasis added).

After taking the above standards into consideration, the Court finds that no jurist of reason could debate the Court's conclusions with regard to Williams' First and Second Grounds for Relief. No reasonable jurist could find that the state courts were unreasonable in determining that Williams failed to present sufficient evidence of mental retardation under *Atkins* and *Lott,* or that the state courts violated Williams' due process rights in reaching this conclusion. Accordingly, the Court will not issue a COA for the First and Second Grounds for Relief set forth in Williams' Amended Petition for Writ of Habeas Corpus.

## VII.    Conclusion

For the foregoing reasons, Williams' Amended Petition is denied. The Court certifies,

pursuant to 28 U.S.C. § 1915(a)(3), that an appeal from this decision could not be taken in good faith, and that there is no basis upon which to issue a certificate of appealability. 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

     IT IS SO ORDERED.

DONALD C. NUGENT
UNITED STATES DISTRICT JUDGE